# CHARLESTON.

*In re* APPLICATION FOR LICENSE TO PRACTICE LAW.

Decided March 15, 1910.

1.  ATTORNEY AND CLIENT—*Application for License—Evidence of Good Character.*

On application to this Court for license to practice law, as provided by section 1, chapter 119, Code 1906, and the rule of this Court made pursuant thereto, the order of the county court, as to the good moral character of the applicant, will be treated as *prima facie* evidence only, and the provision of the statute relating thereto will be construed as prescribing what legal effect as evidence should be given thereto when standing alone and uncontradicted.

2.  SAME—*Application for License—Objections—"May."*

The right to practice law given by said statute is not a *de jure* right, and the word "may" employed therein, in the provision that this Court "*may* upon the production of a duly certified copy of the order of the county court  *  *  *  grant such applicant a license to practice law in the courts of this State," will be construed to have been used in its popular, or permissive sense, and not as synonymous with the word "shall;" and [if upon application for such license and objection to the granting thereof it be clearly shown that the applicant has not the requisite good moral character entitling him to admission to practice law in the courts, his application for such license will be denied.

3.  SAME—*License—Good Moral Character—Evidence.*

A case where, upon charges against an applicant for license to practice law, and protest and objection to granting him license preferred by a bar association, and upon the evidence adduced in support of said charges, he was adjudged not entitled to such license and license refused.

67 W. Va.

Application for license to practice law.

*License Refused.*

*Watts, Davis & Davis,* for applicant.

*Geo. E. Price,* President of Bar Ass'n of City of Charleston, for protestant.

MILLER, JUDGE:

Section 1, chapter 119, Code 1906, is as follows: "1. Any person desiring to obtain a license to practice law in the courts of the State must appear before the county court of the county in which he. has resided for the last preceding year and prove to the satisfaction of such court that he is a person of good moral character, that he is twenty-one years of age, that he has resided in such county for one year next preceding the date of his appearance; and upon such proof being made, the court shall make and enter an order on its record accordingly. The Supreme Court of Appeals shall prescribe and publish rules and regulations for the examination of all applicants for admission to practice law, which shall include .the period of study and degree of preparation required of applicants previous to being admitted, as well as to the method of examination, whether by the court or otherwise. And the Supreme Court of Appeals may upon the production of a duly certified copy of the order of the county court, hereinbefore mentioned, and upon being satisfied that the applicant has shown upon an examination, conducted in accordance with such rules and regulations, that he is qualified to practice law in the courts of this State, and upon being further satisfied that such rules and regulations have been complied with in all respects, grant such applicant a license to practice law in the courts of this State, and such license shall show upon its face that all the provisions of this section and of the said rules have been complied with: provided, that any person who shall produce a duly certified copy of such order of any county court of this State, and also a diploma of graduation from the law school of the West Virginia University, shall upon presentation thereof in any of the courts of this State be entitled to practice in any and all courts of this State, and the order so admitting him shall state the facts pertaining to the same. Every applicant for the examination required by this section shall

pay a fee of five dollars, to be applied to the payment of the costs and charges of conducting said examination."

Pursuant to said section this Court on June 16, 1897, entered the following order: "Until otherwise provided, it is ordered, under chapter 50 of the Acts of 1897, that any person hereafter applying for license to practice law in this State, shall, after a course of reading in the law for two years, appear before the Professors of Law of the University of West Virginia, who are hereby constituted a commission for the purpose, at such times and places as such commission may prescribe, and undergo an examination by them to ascertain his fitness to practice the law in the courts of this State, and such examination shall be such as is required to obtain a diploma of graduation from the Law School of said University and if, upon such examination such applicant shall be found to possess the requisite qualifications, that commission shall grant him a written certificate thereof, and upon it this Court will grant such applicant a license to practice the law."

The applicant has presented a certificate of the law faculty of the University, showing compliance by him with the provisions of said statute and the order of this Court, and also a certified copy of the order of the county court of Kanawha county, entered February 16, 1910, showing that on that day he had personally appeared before and proven to the satisfaction of that court that he was a person of good moral character, was 21 years of age, and that he had resided in said county one year next preceding the date of his application, and has moved the Court to grant him license to practice law.

The Bar Association of the City of Charleston, by its president and secretary, has also appeared and filed their objection and protest against the granting of said license, representing that the applicant was a member of the City Council of the City of Charleston, elected in the Spring of 1909; that a small majority of the Council, including the applicant, having voted against the granting of liquor license in said city, he subsequently, in the month of December, 1909, went to Morgantown, for the declared purpose of taking the Bar examination at the University; that while absent his seat in the council was declared vacant, and C. L. Topping elected to fill the vacancy, such action being based mainly upon what purported to be a telegram from

said applicant to the President of the City Council; that Topping was understood to be in favor of granting liquor licenses; that subsequently said applicant, claiming that he had not resigned his office, and that said telegram was a forgery, brought a suit in chancery in the circuit court of Kanawha county against said Topping to enjoin and prohibit the latter from acting as a member of the City Council; in which case said applicant was examined as a witness on his own behalf, and a large amount of testimony was taken. The following are the specific charges: First, we charge that the said applicant knowingly and willfully testified falsely as a witness in said cause. Under this charge we specify as follows: (a) He testified falsely in stating, at the time he was examined as a witness on the 11th day of January, 1910, that he owned a home in the City of Charleston, West Virginia, and denied that he had some time before that conveyed the property away, and denied that the title thereto was at that time in some other person than himself or his wife. (b) He testified falsely in said cause in his deposition taken February 2nd, 1910, at Charleston, in stating several times in different forms, in substance that the sale and conveyance of his house and lot in Charleston had no connection with or relation to his vacating or resigning his seat in the City Council. Second, we charge that the said applicant, having been elected by the people in his ward as a member of the City Council of the City of Charleston, corruptly sold out his said office.

In support of these charges the protestants vouch the original papers and testimony taken in said cause.

To this protest applicant has appeared by counsel and moved to quash and dismiss the same, for the following reasons: (1) Said protest is not verified; (2) it does not attack the validity and sufficiency of the certified copy of the order of the County Court, heretofore filed by applicant; (3) it does not attack the regularity or sufficiency of the examination of applicant, or his qualification to practice law in the courts of this State, as set out in the certificate of the Law Faculty of the University of West Virginia, filed by said applicant; (4) it does not deny that the rules and regulations made by this Honorable Court, under which said examination was had, were in all respects complied with; (5) the matters set out in said protest do not

raise an issue or give this Court original jurisdiction as involving *habeas corpus, mandamus,* or prohibition proceedings; (6) it seeks to collaterally attack and go behind applicant's certificate of moral character, proven as the law provides and judicially ascertained by a court of competent jurisdiction.

We do not think that there is any merit in the point that the protest is not verified. Protestants vouch the record in the judicial proceedings referred to for the verity of the charges preferred.

The motion to quash involves mainly the proposition that the order of the county court is conclusive on the question of the moral character of the applicant, and that being satisfied by the certificate of the law faculty of his legal attainments there is nothing left for this Court to do but to award the applicant license to practice, pursuant to the statute. It was conceded, in argument, however, that before adjournment of the term at which said order was entered, the protestants or some one else, might in that court have the order set aside and vacated, or perhaps might by bill in equity afterwards have it set aside for fraud, or on some other ground of equitable cognizance, but if no one shall volunteer to institute such proceedings the order is and continues to be *res judicata,* and that regardless of the seriousness of the charges preferred the court must shut its eyes to them and award the license. Such license, it is conceded, would not necessarily bind the Court to admit the licensee to practice in the Court, but would give the applicant a vested right which could be taken from him only for cause occurring subsequently.

These propositions involve to some extent the question of power in the legislature to prescribe qualifications and rules and regulations for obtaining license and admissions to practice law, as well as the proper construction of the statute. The authority of the legislature is denied by some courts, on the ground that courts have the sole right to prescribe for themselves the qualifications of their ministers of justice, and rules and regulations for their admission, without interference by a co-ordinate branch of the government. *In Re Day,* 181 Ill. 90; *In Re Mosness,* 39 Wis. 509; *In Re Splane,* 123 Pa. St. 527; *In Re Branch,* 70 N. J. L. 537 (57 Atl. 431). The Illinois court in *In Re Day* denied the authority of the legislature to

require that possession of a certificate of graduation from a law school of a certain specified standard should entitle the holder to be admitted to practice law. Such right on the other hand seems to have been upheld in New York. *In Re Cooper,* 22 N. Y. 67. See also *In Re Applicants for License to Practice Law,* (N. C.) 10 L. R. A. (New Ser.) and note 288, 143 N. C. 1, 55 S. E. 635.

The North Carolina case just cited is much relied on by counsel for the applicant. The court in this case was divided three to two, the two judges dissenting having filed vigorous dissenting opinions. And the editor of the note to this case just referred to says: "Aside from the above case, no case can be found wherein the court holds or recognizes the right of the legislature to encroach upon the right of the court to require that the attorneys practicing before it shall be of good moral character." The decision of the majority in this case put the right to a license and to practice law in the courts upon the same plane with the right to pursue any other avocation in life, and concedes the right to the legislature to prescribe rules and regulations therefor.

With scarcely an exception it has been held that both in the admission to and suspension from practice of the law, courts act judicially in the exercise of an inherent power, and not in a mere administrative or ministerial capacity, and in the execution of the will of some other branch of the government. *In Re Day, supra,* pages 85, 91; *Ex-parte Secombe,* 19 How. 9; *Garrigus* v. *State,* 93 Ind. 242; *In Re Splane, supra; In Re Garland,* 71 U. S. 333, Syl. 6; *Walker* v. *State,* 4 W. Va. 749, 753; *State* v. *McClaugherty,* 33 W. Va. 250; *State* v. *Stiles,* 48 W Va. 425; *State* v. *Shumate, Id.* 359, and *State* v. *Hays,* 64 W. Va. 45.

But notwithstanding the jurisdiction of the courts over the subject it has been generally conceded that the legislature may in the exercise of its police power, prescribe reasonable rules and regulations for admissions to the bar, which will be followed by the courts. But the legislature may not impose unreasonable rules or deprive the courts of their inherent power to prescribe other rules and conditions of admission to practice. *In Re Day, supra* p. 95; *In Re Leach,* 134 Ind. 665, 671-2; 3 Am. & Eng. Ency. Law, 287; 4 Cyc. 900; *Ex-parte Secombe, supra; In Re*

*Goodell,* 39 Wis. 232, 20 Am. Rep. 42. The Wisconsin court, in the case last cited, says: "In courts proceeding according to the course of the common law, a bar is almost as essential as a bench. And a good bar may be said to be a necessity of a good court. This is not always understood, perhaps not fully by the bar itself. On the bench, the lesson is soon learned that the facility and accuracy of judicial labor are largely dependent on the learning and ability of the bar. And it well becomes every court to be careful of its bar and jealous of the rule of admission to it, with the view to fostering in it the highest order of professional excellence." And again at page 240, it is said: "The legislature has, indeed, from time to time, assumed power to prescribe rules for the admission of attorneys to practice. When these have seemed reasonable and just, it has generally, we think, been the pleasure of the courts to act upon such statutes, in deference to the wishes of a co-ordinate branch of the government, without considering the question of power." Again, referring to what the Court characterizes as "the unwise and unseemly act of 1849," it is said: "If, unfortunately, such an attack upon the dignity of the courts should again be made, it will be time for them to inquire whether the rule of admission be within the legislative or the judicial power. But we will not anticipate such an unwise and unbecoming interference in what so peculiarly concerns the courts, whether the power to make it exists or not. In the meantime, it is a pleasure to defer to all reasonable statutes on the subject. And we will decide this motion on the present statutes, without passing on their binding force." After this decision the legislature of Wisconsin enacted that "no person shall be denied admission or license to practice as an attorney in any court of this state on account of sex." The applicant Miss Goodell then again applied for admission to practice, and the court while questioning the absolute and exclusive power of the legislature to make rules or to declare who shall be admitted as attorneys to practice in the courts, nevertheless decided to admit the applicant without considering the question whether under the constitution and laws of that state the legislature had the power to prescribe the rule of admission to the bar. *In Re Goodell,* 48 Wis. 693. In *In Re Day,* at page 89, quoting from *Ex-parte Secombe, supra,* the court says: "And it has been well settled by the

rules and practices of common law courts that it rests exclusively with the courts to determine who is qualified to become one of its officers as attorney and for what cause he ought to be removed, * * * and we are not aware of any case where a *mandamus* was issued to an inferior tribunal commanding it to reverse or annul its decision, where the decision, in its nature, was a judicial act and within the scope of its jurisdiction and discretion." Many of the decisions contain an historical resume on the subject, but it is unnecessary to go into this. Mr. Minor, IV Minor Inst. 192-206, covers the history of the legislation in Virginia and shows that the statutes of that state, which were adopted into this State, were the outgrowth of the deplorable conditions into which on account of bad legislation the profession of the law had fallen. It is sufficient to say that the doctrine of the cases cited is well founded.

We are not disposed here to question the validity of the statute of this state, or the power of the legislature in enacting it. We treat it as valid, and as a reasonable exercise of a power generally conceded to it by the courts. Indeed the statute is nothing more than a declaration of the qualifications which in all times have been considered essential to admission to the bar, namely, legal learning and good moral character.

In the light of the authorities what construction should be given our statute? Having accepted the duties of executing the law we should unquestionably give it a construction which will best accomplish its object. It could have but one object, namely, to bar out incompetent persons, and persons not possessing the requisite moral character befitting officers of the courts. Previous legislation may cast some light on the subject. By the Code of 1868, chapter 119, any two judges of the courts of this State were authorized to grant licenses in writing to practice law in the courts thereof to any person who should on examination be duly qualified, and who should produce the certificate of the board of supervisors of the county where he had resided for one year preceding, that he was a person of honest demeanor, and was over twenty one years of age. By the acts of 1872-3, any three judges composed either in part or in whole of the Supreme Court of Appeals were authorized to grant such license upon the same conditions. By the act of 1882 the applicant as a condition to being examined by such

judges and obtaining from them such license was required to
appear before the county court of the county in which he had
resided for the last preceding year, and prove to the satisfaction
of such court that he was a person of the requisite moral char-
acter, of the requisite age, etc., of which the court was required
to enter an order of record, and to produce to the judges a
certified copy of such order. This was the last enactment pre-
ceding our present statute. While all of these statutes require
of the applicant legal learning, and proof of his good moral
character to be shown by a certified copy of the order of the
county court, the present statute imposes the whole duty of
prescribing rules and regulations for the examination of appli-
cants for admission, and the granting of license to practice law
in the courts, upon this Court as a court. Did the legislature
mean by imposing this duty upon the Court, that it should
accept such order as conclusive—*res judicata*—on the question
of moral character, though it might have before it the strongest
evidence that at the time of obtaining such order the facts had
been suppressed and that the applicant was then guilty of such
gross immorality as should bar him from admission to practice
in the courts? If so, the Court in granting the license would
be placed in the attitude of being compelled in one instant to
authorize an applicant to exercise an office which immediately
afterwards, on motion for his admission, it would upon the
highest moral grounds be bound to deny him. It could not
have been intended to put the Court in any such plight. If
the certificate would not bind the Court on motion or applica-
tion for admission to practice, why should it be treated as more
than *prima facie* evidence of the requisite moral character on
an application for license? This is the only effect the order of
the county court could have if the applicant should present it
along with a diploma from the law school of the University.
True the statute says that any person who shall produce a duly
certified copy of such order, and also such diploma shall upon
presentation thereof be entitled to practice in any and all the
courts of this State, but can it be seriously contended that the
courts would be bound to admit such person, if found unfit in
point of moral character? We can not assume the legislature
thus intended to impose unworthy persons upon the courts. The
contrary is to be presumed. We must construe the statute as

intended to be in aid of the courts, and to leave this Court, upon an application for license, and all the courts upon application for admission to practice, free to treat the order of the county court simply as *prima facie* evidence, and to institute any other and further inquiry into the moral character of the applicant deemed necessary. Otherwise the act of the legislature would have to be declared an encroachment on the judiciary, and void on constitutional grounds. This conclusion is supported by the principles enunciated by the New Jersey court in a case styled, *On Application for Attorney's License,* 21 N. J. L. 345, and by the reasonings in the dissenting opinions of Judges Brown and Walker in the North Carolina case of *In Re Applicants for Attorney's License to Practice Law, supra.* As is well said in that case by Judge Brown, following the New Jersey case : "The purpose of the act being to exclude men of bad character from the profession, it follows logically that certificates of good moral character are merely a preliminary requisite before the applicant can be examined as to his legal acquirements. They make out a *prima facie* case, and, if uncontradicted, entitle the applicant to his license if he passes the legal examination. The statute only prescribes 'what legal effect shall be given to a particular species of evidence if it stands alone and uncontradicted." ·

But many decisions are cited for the proposition that in the constructions of statutes the word *may* will be construed to be synonymous with the word *shall* when the public or a third person have a claim *de jure* that the power should be exercised. The following are some of the cases. *Bansemer* v. *Mace,* 18 Ind. 27; *Kane* v. *Footh,* 70 Ill. 587, 590; *Mayor, &c.* v. *Furze,* 3 N. Y. 612, 615; *Newburgh Turnpike Co.* v. *Miller,* 5 Johnsons Ch. (N. Y.) 101, 113; *Brokaw* v. *Com'rs,* 130 Ill. 482; *Fowler* v. *Pirkins,* 77 Ill. 271; *Hayes* v. *County of Los Angeles,* 99 Cal. 74; *Ex-parte Lester,* 77 Va. 663. The language of Chancellor Kent in *Newburgh Turnpike Co.* v. *Miller, supra,* is that "the word *may* means *must* or *shall* only in cases where the public interest and rights are concerned, and where the public or third persons have a claim, *de jure,* that the power should be exercised." This rule of construction as will be found by reference to the cases cited, is to enable the courts to effectuate the will of the legislature, and for no other purpose. Can it be

said that the legislature intended, or that the interests of the public demand the licensing of incompetent and immoral persons to practice law in the courts? Certainly not. Can it be said that an applicant, because he has produced *prima facie* evidence of his compliance with the rules of the Court, and the provisions of the statute has a *de jure* right to a license to practice? We have never understood this to be law. After he has obtained license his status is somewhat different. He is then entitled under the law to apply for admission to practice in all the courts, a right perhaps which can not be taken from him except by appropriate legal proceedings. But a court would not be bound to admit him to practice if on proper showing he should be found not of the requisite moral character. And after admission it could for the same cause strike his name from its rolls. 3 Am. & Eng. Ency. Law, pp. 282-3-4; *Cohen* v. *Wright,* 22 Cal. 293, 320; *In Re Garland, supra,* 378; *In Re Splane, supra; Ex-parte Secombe, supra; In Re Day, supra; State* v. *Mc-Claugherty, supra; State* v. *Hays, supra; People* v. *Kavanaugh,* 220 Ill. 49, 77 N. E. 107. In *Cohen* v. *Wright,* the California court says: "The right is subject to the condition that the attorney shall possess a blameless moral character and it is forfeited upon a breach of that condition." It is said in 3 Am. & Eng. Ency. L., at page 287, on the authority of some of the cases cited that: "It lies within the power of the legislature to prescribe the qualifications required to admission to the bar, and the courts will have no authority to admit any person not possessing the required qualifications." "But the admission of an applicant to practice is a judicial act, and the attorney, when admitted, is an officer and member of the court; the legislature has no power, therefore, to provide that any person possessing certain qualifications must be admitted; it cannot assume judicial powers; and in every case the courts are vested with discretion as to whether any applicant is entitled to admission."

A right to a license or to admission to practice law is not a right *de jure* given by statute, and we do not think the rule of construction invoked has any application to the case in hand. *Ex-parte Lester,* 77 Va. 663, relied on by counsel, involved a right given by statute to obtain a liquor license. The statute there was a revenue measure, in which the public, as well as

the applicant, had an interest. In that case *may* was construed
to mean *must*. But that ruling can have little if any applica-
tion to this case. Such is the case also of *Leigton* v. *Maury*, 76
Va. 870. As is held in *Harrison* v. *Wissler*, 98 Va. 597: "It
is only 'where it is necessary to give effect to the clear policy
and intention of the legislature" that the word *may* can be con-
strued to mean *must*. The case we have here is more like the
case of *Ex-parte Yeager*, 11 Grat. 655, 656, involving a statute
authorizing the granting of a license to keep an entertainment,
and providing that if the Court be of the opinion that the
applicant is sober and of good character, and will probably
keep a house orderly and such as the law requires it *may* grant
such license. It was held in that case that the word *may* in the
statute was used in its popular sense—that is in its permissive
sense—and was employed to grant an authority coupled with a
discretion, which discretion from its very nature did not admit
of review by an appellate court. In *Echols* v. *Brennan*, 99 Va.
150 (37 S. E. 786, 787), the Virginia court held that the word
"may" in the statute providing that where there has been no
proceedings in a cause for five years the court in its discretion
may dismiss, and *may* direct the order to be published in such
newspaper as it may designate, is not bound to be construed
"shall," as the public has no interest in such publication, and
no party has a claim of right to such publication. The rule
on this subject is best expressed by Mr. Justice Story of the
Supreme Court of the United States, in *Minor* v. *The Mechanics*
*Bank of Alexandria*, 1 Peters 46, 64, as follows: "The argu-
ment of the defendants is, that 'may,' in this section, means
'must'; and reliance is placed upon a well known rule in the
construction of public statutes, where, the word 'may,' is often
construed as imperative. Without question, such a construction
is proper, in all cases where the legislature mean to impose a
positive and absolute duty, and not merely to give a discretionary
power. But no general rule can be laid down upon this subject,
further than that that exposition ought to be adopted in this,
as in other cases, which carries into effect the true intent and
object of the legislature in the enactment. The ordinary mean-
ing of the language, must be presumed to be intended, unless
it would manifestly defeat the object of the provisions."

For the reasons given the motion of applicant to quash and dismiss has been overruled.

After this ruling of the Court applicant tendered and filed his sworn answer to the charges preferred against him. The only evidence submitted, except sundry ex-parte affidavits of applicant's previous good character and the affidavit of R. G. Hubbard as to the value of his property, is the record in the chancery cause of applicant v. Topping, vouched by protestants in support of said charges.

We appreciate the importance of our decision to the applicant. But the case presented imposes upon us a solemn duty, involving as it does not only his interests and future prospects, but the interests of the whole State in the honor and purity of the bar, and the administration of justice in the courts. We are impressed, though not unduly, with the fact that this is not an ordinary lawsuit, in which the protestants are contending for some personal or property right. The bar association at the seat of the State Government, composed of men of the highest standing in the profession, who could have been inspired thereto by no other possible motive than to maintain the standing of the profession, and to protect the courts against imposition, and after a thorough investigation of the facts, have petitioned this Court not to grant a license to applicant. We can not turn a deaf ear to this appeal. We must assume the responsibilities and discharge the duties of our office.

The answer of the applicant does not deny that he swore as a witness in both instances substantially as charged. He could not have done so in the face of the record. He does not deny but admits in his evidence given at Charleston, that at the time he testified at Morgantown he had sold his property on December 2, 1909, and had on December 6, 1909, with his wife, acknowledged and delivered the deed therefor to the attorney for the purchaser. Nor does he deny that on December 31, 1909, he met the same attorney at a hotel in Charleston, where they together calculated the amount that was coming to him after deducting a balance of purchase money he still owed on the property, and which was secured by a vendor's lien. He does not deny but admits that this amount was there tendered to him in cash, and that at his request the attorney agreed to deposit the amount to his credit in bank, and that it was so deposited, not

by the attorney, but at the latter's request by another representative of the purchaser. The only explanation offered by the applicant is that at the time he testified, January 10, 1910, he had not received from the bank the pass book which the attorney had said he would have mailed to him, and had not received a note which the attorney agreed to take up and mail him. Nothing had in fact intervened to effect his sale and conveyance. The money had then been deposited to his credit, and the bank pass book had been mailed to him, but applicant denies having received it until he returned to Charleston. There is evidence in the cause, not strictly of a legal character—a letter from the postmaster at Morgantown—showing that mail from the same bank had been delivered to applicant before he left that city. Whether or not he had received the pass book is not very material, for the evidence alluded to and other evidence, with many inculpatory facts and circumstances shown in evidence, satisfies us beyond any doubt, that at the time applicant gave his testimony on January 10, 1910, he had, and that he well knew he had parted with the title to his property, and that his evidence was untrue. It is unnecessary and impossible to detail all the evidence bearing on this question. There was a period during which this deed was held in escrow, that was from December 6, 1909, the date it was acknowledged and delivered to the attorney, to the date applicant's seat in the council was vacated and Topping elected in applicant's stead, and perhaps also from that time on up until December 31, 1909, when the transaction was closed by payment of the purchase money into bank to applicant's credit. The testimony of the attorney, denied by applicant, is that it was understood that he was to hold the deed until applicant's seat in the council should be declared vacant. A most significant and convincing fact in connection with this charge of false swearing testified to by the attorney holding the deed and not denied by applicant is, that after he had given his evidence, January 10, 1910, he asked permission to change the deed to a later date.

We are also satisfied, beyond a reasonable doubt, that applicant's evidence that his sale and conveyance of his property had no connection with or relation to his vacating his seat in the city council, was false. He confesses to numerous meetings in private places with various liquor dealers and other persons

interested in getting him to vote for license, or to vacate his seat in council, and that he had negotiated with at least three of them for a sale of his property and had discussed with them the subject of the sale thereof, and of removing from his 'ward, or from the City of Charleston, and to whom also he had made various propositions of sale or trade, involving from $300 to $1000 advance on the price which he had paid for the property a few months before. He practically admits that he requested the attorney to whom he delivered the deed not to record it for several months, and the attorney says it was understood he was not to pay over the money to the applicant until applicant's seat in the council had been vacated. The deed was made to U. G. Young, but W. B. Geary was the real purchaser. While applicant denies that he knew this, yet on December 11, 1909, only five days after he had acknowledged and delivered his deed to Geary's attorney, he wrote Geary from Morgantown as follows: "Morgantown, W. Va., Dec. 11, 1909. Mr. W. B. Geary, Dear Sir: See your attorney and tell him I did not get to see President McCorkle before I left, and to tell him to state the fact to the council, that I am here with my wife for an indefinite time to finish my law course, and for some one to make a motion to declare my place vacant, as I do not know when I will be back. Have it thoroughly understood so there will be no hitch about it, for my wife may go back in a few days, or I might have to go back for some purpose myself. Be sure and attend to it Thursday night, as I want it off hand at once. I talked with Mont Topping in Parkersburg he said he would look after it. You must wire me in care 'Hotel White' at my expense as soon as the place is filled Thursday night, and 'who gets it. I may stay here till April, but I might be called home at any time, so attend to this promptly. Very truly, —————————." Applicant's explanation of this letter is that Geary called him over the telephone and annoyed him, wherefore this letter. But the evidence leaves no room for doubt that the real reason for writing Geary was to get the purchase money for his property released. Other letters and telegrams to the president of the council and other persons, and much other evidence in the cause, all assure us of the correctness of our conclusion.

Lastly, did the applicant as charged corruptly sell out his

office? He denies it. But there is much evidence besides that already referred to leaving no room for doubt that he did. That the agreement was that he was not to get the purchase money for his property until his seat in the council was either resigned or declared vacant there is not a shadow of doubt. He attempts to support his denial of this mainly by the affidavit of Mr. Hubbard as to the present value of the property. Hubbard, a good business man, had sold this property, to applicant, February 24, 1908, at the price of $3500.00. The material part of his affidavit is: "This lot was afterward, and before the 2nd day of December, 1909, improved in many ways, including sewer connections, and affiant considers it is, and was on the 2nd of December, 1909, worth in excess of $4000.00, and perhaps all of $4500.00." This affidavit is guarded. So far as the evidence discloses all of applicant's negotiations for the sale of his property was with persons interested in getting his vote for license, or getting his seat vacated, and another installed in his place, who favored granting license. The evidence convinces us that applicant had offered this property to one or the other of these persons all the way from $3800 to $4500, the price finally obtained, and that it was in consideration of this big round price that he was induced to sell and go away, that the purposes of those whom he admits had on other occasions undertaken to bribe him to lay down and desert his office might be accomplished.

The fact that applicant had refused direct offers of bribery, had not directly resigned, (unless he actually sent the telegram of resignation denied and branded by him as a forgery), and had never voted for license, were all urged upon us in argument to absolve applicant from the charges of wrong doing. It was plainly not applicant's plan to resign, or sell out his office directly, but indirectly. In this he showed some shrewdness. His plan was to go away and have his seat declared vacant, and the consideration for the betrayal of his trust covered into the price for his property, and thus accomplish by indirection what he feared to do directly. At the meeting of council on the night of December 6, 1909, the day on which he acknowledged and delivered the deed for his property, and just before leaving for Morgantown the following morning, he took the precaution to say to some of his fellow councilmen that that was the last

meeting he would attend, that he was going away for an indefinite stay. It is quite natural that one occupying his position should want to cover his transactions with a proscenium curtain; but the Court seeing from the evidence now before it what the actors were doing behind the proscenium, can not be influenced by the things done to shade the real transaction.

In council there was no substantial disagreement between us as to what the evidence proves. We divided on the question of jurisdiction to go behind the order of the county court on the question of the applicant's moral character. Three of us were and are still of the opinion that that order is only *prima facie* evidence, and that its force as evidence has been wholly overborne by the other evidence submitted to us.

Our conclusion, though with great regret, is to refuse the applicant license upon his present application.

Justice, however, may always be tempered with mercy; and after a reasonable lapse of time, and a satisfactory showing that the applicant has repented of his wrong, and is living the exemplary life and maintaining the good character which numerous affidavits filed show he bore prior to the offences charged against him, he will be entitled to the favorable consideration of this Court, and this decision shall in no way conclude us upon a subsequent application.

*License Refused.*

POFFENBARGER, JUDGE, *(dissenting):*

Being of the opinion that practically all the premises laid down in the opinion of the majority of the Court, as legal propositions, constituting the basis of the decision, are unsound and condemned by reason, historical facts and the best considered decisions, and that the conclusion announced is contrary to law, I am unable to concur in it. In my opinion, the certificate of the county court, as to the requisite of good moral character, is conclusive. Hence I neither make, nor concur in, any finding as to the charges set forth in the protest. Disregarding them and all the evidence adduced to sustain them, as being wholly immaterial, I favor the granting of the license. I have never come to any final conclusion that the applicant is guilty of false swearing or perjury. There is much doubt, in my mind, as to whether, in saying he had not sold or conveyed his property,

he was not testifying to a mere conclusion he believed to be
true. Later he admitted all that had been done. I did express
an opinion as to his knowledge and motive in conveying his
property, but I make that no part of my decision, nor do I
assert that it involves moral turpitude, justifying refusal of a
license, under the statute as construed by my associates. Utterly
dissenting from that construction of the statute, and deeming
the questions of fact, raised by the protest immaterial, I do not
decide them at all. Therefore, any remarks I may have made as
to motive or purpose have no more to do with the conclusion of
my associates than if they had been made by some one not a
member of this Court, and have absolutely no place whatever in
my own.

There is a distinction between the licensing of a person to
practice law and his admission to the bar of the court, after
he has been licensed. This Court alone can grant a license.
That license is good all over the state, but it alone does not
admit its holder to the bar of any court in the state, not even
this, the granting, Court. A subsequent act of admission is
essential to enrollment as a member of the bar, and each court
must do that for itself. The license is an essential pre-requisite
to admission. Without it no application for admission can be
made, but it is not admission, nor the equivalent thereof. Prac-
ticing without admission, after having obtained a license, is
made a misdemeanor and punished by fine. Whether a licensee
can be denied admission is another question altogether, and has
no material bearing on the interpretation of the statute. In
marking this distinction between license and admission, I am
merely stating the plain terms of the statute. 4 Min. Inst. Part
I, 204.

From this it is plain that the license only enables its holder
to apply for admission. The requirement is a limitation upon
the right to make such application. The legislation, imposing
this restraint, is directed primarily to citizens not attorneys.
It concerns the entry of a citizen upon a certain vocation. With-
out this limitation, any citizen could apply for admission. Under
it, only those who have complied with certain conditions can do
so. This measure of regulation is justified by the police power
of the state, vested in the legislature. In nature, it is not
unlike other license statutes. It is not an enabling act. On

the contrary, it is a limiting, regulating, act. Having plenary power over this subject, the legislature is the sole judge of the extent of the limitation. It could say the certificate of the county court as to moral character should be conclusive upon the person or tribunal, charged with the duty of granting the license. The extent of the limitation is a mere question of policy, lying wholly within the discretion of the legislature. It is not the province of courts to revise the work of the legislature and supply what, in their opinion, are omissions of provisions necessary to make a statutory system or plan wise and expedient. If that could be done in one case it could be done in all, and the courts would become legislative, as well as judicial, tribunals, a result positively forbidden by the Constitution of the State. Why should the courts add conditions to a statute,. prescribing the mode of procuring a license to practice law, any more than to one, prescribing the mode of procuring a license to practice medicine, or keep a hotel, or sell sewing machines, or act as a broker or real estate agent, or do any other lawful act? It cannot be maintained that there is any power in the · courts to require more than the statute specifies in any of these cases; but it is solemnly asserted that the legal profession is distinguishable from all other vocations in that it pertains to the judiciary, and this is invoked as justification for the departure from the rule governing in all other cases. To this, I cannot assent, but I defer discussion of it for the present.

This distinction between license and admission or membership of the bar has not escaped judicial notice. On the contrary, it has been asserted and emphasized. In *Fisher's Case,* 6 Leigh 619, the superior court summarily revoked and annulled Fisher's license for what it deemed malpractice committed in its presence. On an appeal to the general court of Virginia, this judgment was reversed, the court holding that, before such a judgment could be pronounced by the court below, the party accused must be regularly prosecuted by information or indictment and found guilty by a jury. It was observed, however, that the court, for misconduct, could have suspended or annulled the license, so far as it authorized the attorney to practice in the particular court, but no further. This would have amounted to nothing more, in effect, than disbarment or striking the attorney's name from the roll of that particular court. Fry,

Judge, said: "But it is believed, the power of no court at common law, extends farther than to fine, imprison, or disbar from its own forum.  Contempts, or other misconduct, may be punished by fine, imprisonment, or striking from the roll of attorneys. But striking from the roll of one court did not extend to any other court.  *  *  *  This power of the court, it seems to me, is ample to vindicate a due respect for itself and the laws, in a case like that in this record.  The additional power of summary suspension or revocation of license, is not necessary for such purpose."  In *Ex-parte Hunter et als*, 2 W. Va. 122, 144, Judge BROWN said: "The license, of itself, and before admission or induction by the Court, does not constitute the holder an attorney or officer of any court, but simply entitles him to be admitted as such, to practice in all the courts of the state, upon his taking the oaths required by the laws in force at the time of such admission, unless good cause appear to the Court for withholding its permission.  Any cause that would warrant the suspension or expulsion of an attorney from the office or, as it is commonly called, striking his name from the roll of attorneys, would equally authorize a refusal of admission."  He further says the admission of an applicant is a judicial, and not merely a ministerial act.  Proceeding further he says: "It will be observed also, that there is a marked distinction between the power of the Court to supersede or annul the attorney's license, as provided in the fifth and sixth sections of chapter 164 of the Code, and the common law power to disbar him from practicing as an officer of the particular court.  In the former case it can only be done for the causes assigned, and in the mode prescribed by the statute, and when so done supersedes and annuls the license altogether, and alike debars from admission, and disbars after admission from all the courts of the state.  But in the latter case, that is, of amotion or suspension from the particular court—the Court exercises only the common law powers of a court of record, and its judgment, whether called a judgment of amotion, suspension, expulsion, disbarment, or striking from the roll of attorneys, only affects the official position of the party in that particular court."  In *State v. Mc-Claugherty*, 33 W. Va. 250, this Court held as follows:  "A circuit court may, independent and outside of the provisions of section 6, chapter 119 of Code 1887, strike the name of an

attorney from the roll of such court for sufficient cause, but it cannot, except in the manner provided by said statute, suspend or annul the license of an attorney."

From the nature of a license, as we define and interpret it, as well as from the character of an attorney's business, it follows that the regulation thereof belongs to the police power of the state, exercised by the legislature and not by the courts, except in so far as the latter are charged with some duty in the execution of the power of the former. While the legal profession, like all other vocations, rising to the dignity of professions, is honorable, such as those of teaching and medicine, the practice of the law is still nothing more than a vocation. An attorney is in no sense a representative of the court in which he practices. By virtue of his mere office of attorney, he neither represents nor binds the court by any act of his. He is neither its agent nor its servant, although it may require of him the performance of certain duties. His subjection to the power of the court in this respects does not flow from any representative relation. It is based upon the power of the court to make his right to practice therein dependent upon conditions, or upon the law imposing conditions enforcible by the court. He has no judicial power and performs no judicial function. He is merely the adviser and advocate of his client. His advice never binds the court nor protects his client, and, as advocate, he can demand nothing. These propositions are, or should be, matters of common knowledge, such as even laymen should know. Those who doubt them and rely upon bad advice of attorneys suffer a rude awakening in the courts. This is every day experience in litigation. The contention, therefore, that legislative regulation of the licensing and admission of attorneys is an invasion of the power and authority of the judiciary, stands upon no legal principle. Legislative interference with something, pertaining to the courts, which is not, in any sense, judicial in character or function, cannot possibly constitute an invasion of the judicial department of the government. Suppose an attorney is an officer of the court in a certain sense. So are its clerk and sheriff. Certainly these offices can be made elective, notwithstanding their relations to the court are just as close in nature as that of attorneys, and their powers and functions, as instrumentalities in the administration of justice, are far more im-

portant and powerful than those of an attorney. They are
elective. They are so clearly independent and devoid of judicial
power, that, by the constitution and laws, such persons as the
people see fit to elect are installed in these offices. Why may
not the legislature do the same in respect to attorneys? The
truth is, notwithstanding dicta and and ill-considered opinions
to the contrary, that the right to admission as an attorney
never was a judicial right at common law, nor at all except
in so far as it has been made so by statute. At first, attorneys
were appointed by royal letters patent under the great seal,
commanding the justices to admit the persons therein named
to be attorneys for certain persons. Later, the whole subject
was regulated by statute 1 Bacon's Ab. 474. The history of
this subject, given in the work just cited, amply sustains the
following statement and conclusion of the court of last resort
of New York *In Re Cooper,* 22 N. Y. 67, 90: "But the most
serious objection to the law, and that upon which the judgment
of the court below was mainly based, is, that the power to appoint
or admit attorneys and counsellors is vested exclusively in the
courts, and that in this respect the act in question is in conflict
with the Constitution and void. If such an exclusive power is
vested in the courts, it must be derived directly from some
specific provision or provisions of the Constitution. It cannot
be claimed as a part of the inherent power of the courts, or
as resulting necessarily from their organizations as courts. To
show this, it is unnecessary to go at length into the history
of attorneys and counsellors as a separate class. It will be
sufficient briefly to refer to the manner in which, prior to the
Constitution of 1846, they had received their appointments both
here and in England. Barristers or counsellors at law, in
England, were never appointed by the courts at Westminster,
but were called to the bar by the Inns of Court, which were
voluntary unincorporated associations. The power of the court
to appoint attorneys as a class of public officers was conferred
originally, and has been from time to time regulated and con-
trolled in England, by statute. (4 Hen. IV., chapter 18; 3
James I, chapter 7; 6 and 7 Vict., chapter 73, section 27; 20
and 21 Vict., chapter 77, sections 40-45). In this State it
seems that attorneys, prior to the Revolution, were appointed
by the Governor of the Colony. (*People* v. *The Justices of*

*Delaware,* 1 Johns. Ca., 182).  .By the Constitution of 1777, the power of appointing this class of officers was vested directly in the courts; but the Constitution of 1822 was silent upon the subject, thus leaving the matter in the direction and control . of the legislature, which at its next session passed an act requiring attorneys to be licensed by the courts in 'which they should respectively practice.  It is plain, therefore, that although the. appointment of attorneys has usually been entrusted in this State to the courts, it has been nevertheless, both here and in England, uniformly treated, not as a necessary or inherent part of their judicial power, but as wholly subject to legislative action.  I take no notice of the distinction between attorneys and counsel in the courts of this State, because the same principles in respect to the mode of appointment are of course applicable to both."

The history of the law, concerning the licensing and admission of attorneys in Virginia, as set forth in 4 Min. Ins., p. 199, . shows that, from the earliest times, the subject has been regulated by statute.  In 1642, what was then known as the Grand Assembly required licenses from what was called the Quarter-Court, held by the governor and council, and one county court, and prohibited practice 'without it.  In 1645, what were called mercenary attorneys were prohibited and required to be expelled. In 1656, the legislation, relating to mercenary attorneys, was repealed.  In 1658, it was enacted "that noe person or persons whatsoever, within this collony, either lawyers or any other, shall pleade in any courte of judicature within this collony, or give councill in any cause, or controvercie whatsoever, for any kind of reward or profit whatsoever."  In 1680, it was provided that lawyers should be licensed by the governor, in order to exclude impertinent, busy and ignorant men from pretending to practice law.  In 1682, this act was repealed.  In 1718, a statute was passed regulating the charges of attorneys.  In 1732 practicing in the county courts, without a license, issued by the governor and council, upon examination by persons learned in the law, was prohibited.  In 1786, a statute was passed by the General Assembly providing "That no person except the attorney general, shall be permitted by any court to practice therein as a counsel, attorney at law or proctor, unless he shall heretofore have obtained a license, in the manner prescribed by the law then in force, or until he shall obtain a license in

writing from three of those, who shall be at that time, judges of the high court of chancery or general court; which license, if he produce to them a certificate from the court of that county wherein his usual abode shall have been during twelve months next preceding, that he is a person of honest demeanor, such three judges are empowered and required to grant under their hands and seals, if, after examination, it be their opinion, that he is duly qualified." On Feb. 15, 1819, an act was passed, providing that, before any person should be licensed to practice law, he should produce, to those thereby authorized to grant licenses, a certificate from the court of that county or corporation where he had usually resided for the preceding twelve months that he was a person of honest demeanor and upwards of twenty-one years of age; and that three of the judges of the superior court, upon such certificate being produced to them, might grant a license. The Codes of 1849 and 1860 contain this provision: "Any three judges of the superior courts of this State may grant a license in writing to practice law in the courts thereof, to any person who shall on examination be duly qualified, and who shall produce to them a certificate of the court of the county or corporation where he has resided for one year next preceding, that he is a person of honest demeanor, and is over twenty-one years of age." Code 1860, chapter 164, section 1. After the organization of this State, the statutory provisions were substantially the same, until the act of Feb. 17, 1897, became effective, and then the provision as to age, residence and moral character was not altered. Going back over these provisions, we observe that, from 1786 to 1819, a period of thirty-three years, a statute mandatorily required three judges to grant a license, on ascertainment of the possession of the necessary educational qualifications and the production of a certificate of the county court, showing residence and character. Never, in all the history of this State or Virginia, has any superior court been charged with the duty of ascertaining the moral fitness of the applicant. For one hundred and twenty-four years, this duty has been committed to county courts and no other. For more than one hundred years, the duty of issuing licenses to practice law was charged, not upon any court, but upon three judges of superior courts. Not until 1897 was it ever imposed upon any superior court,

and then no authority was conferred upon that court to conduct any inquiry as to age, residence or moral character. That function was left 'where it had been for more than a century. From 1786, it has been necessary to procure, first, a license, and, second, admission.

The general effect of this legislation has been a subject of judicial determination and interpretation by this Court. In *Ex-parte Hunter*, 2 W. Va. 122, 152, Judge BROWN said: "Again, attorneys have been the unquestioned subject of legislative control by the British Parliament from the reign of Henry III to the present time, and by the colonial legislature of Virginia, almost from the time of its inauguration until the Revolution. This control has at all times beeen most absolute, and by the colonial government most arbitrary, and often inconsistent, unjust and even oppressive; prescribing their oaths and how they might be licensed, and admitted. to practice, and again expelling the whole profession from the bar; sometimes prescribing a fee, then changing them as suited the caprice of the legislature, and then again prohibiting, under severe penalties, their receiving any fees at all, and in some acts called and treated as a nuisance, and in some as mercenary attorneys. Yet no complaint is heard nor opposition offered to the power of the legislature in the premises except in a single instance, and then the power was re-asserted and enforced by the assembly. * * * Thus it would seem that in England and Virginia, until the ratification of the Constitution of the United States, attorneys at law were subject to the absolute control of the legislature as respects license, admission to the bar, and expulsion from it, oaths, fees and no fees, duties, conduct and punishment; and 'whether that control affected them prospectively or retrospectively, it was all the same; that control being influenced by considerations of a public nature, and based on the right and duty to subserve the public, was rarely, if ever, subordinated to the private interests of the attorneys." We have already analyzed cases in which this Court and the Virginia court have acknowledged the power of the legislature to control their action in respect to an attorney's license. In both *Fisher's Case* and the *McClaugherty Case* it has been solemnly declared and adjudged that the court cannot revoke a license in any manner other than that prescribed by the statute. Legislative

denial and limitation of compensation of attorneys and their
complete expulsion from the courts can mean nothing short of
full and complete legislative power over them and over the
courts as regards them.    If the exercise of power to declare
that nobody shall act as attorney and to enforce the declaration
does not mean complete legislative power over the subject, I
am unable to perceive any relation between cause and effect or
any obligation or force in logic.    The power to regulate attor-
neys' fees implies the same.    Power in the states to tax federal
agencies, such as national banks, is denied, not because of any
express inhibition of the federal constitution, but because power
to tax at all implies power to tax without limit and that means
power to destroy.    A power of regulation or control, given for
some purposes, must exist for all, unless there is an organic
limitation.    The legislature has always controlled the licensing
of attorneys in this State and its power to do so has never been
denied until now.    The admission of attorneys, an essentially
different thing, has been left, by the legislature, to the discretion
of the courts.    It has never attempted to interfere with that,
but its failure to do so does not argue lack of power to regulate
it.    There can be no loss of legislative power by non-user, as
in some other cases.    Its non-action simply leaves the common
law in force, which continues only until altered by the legis-
lature.    Con. Art. VIII., section 21.    Our decisions on the
subject of admission and disbarment, *Walker* v. *State,* 4 W. Va.
749; *State* v. *McClaugherty,* 33 W. Va. 250; *State* v. *Stiles,*
48 W. Va. 425; *State* v. *Shumate, Id.* 359; and *State* v. *Hayes,*
64 W. Va. 45, do no more than declare the common law, un-
affected by statute, not because the legislature cannot interfere
with the subject but merely because it has not done so.    There
is not a suggestion of lack of legislative power to do so in any
one of them.    No decision of the federal supreme court con-
tains a hint of any such lack of authority. . It is not found in
*Ex-parte Secombe,* 19 How. 9, nor *Ex-parte Garland,* 71 U. S.
333, nor *Ex-parte Wall,* 107 U. S. 265.    In the *Secombe Case*
it was found that a statute did govern and was substantially
the same as the common law.    There are a few State cases which
assert the supremacy of the courts over the legislature in respect
to the admission and disbarment of attorneys: *Petition of Splane,*
123 Pa. St. 527, a mere *obiter dictum; Ex-parte Mosness,* 39

Wis. 509, another *dictum* pure and simple; *In re Goodell,* 39
Wis. 232, in which the court indulged in a lot of high-sounding
platitudes and a threat to the legislature and refused the appli-
cant admission because of her sex, justifying its action in part
on the lack of a statute authorizing admission of women; *In re
Goodell,* 48 Wis. 693, in which, obeying a later statute, expressly
forbidding denial of admission or license to any person on
account of her sex, the same court merely reiterated its doubt
as to legislative jurisdiction and power and admitted the appli-
cant; *Application for Admission,* 31 Barb. (N. Y.) 353, deny-
ing legislative power, but most emphatically overruled by *In
re Cooper,* 22 N. Y. 67; and *In re Day,* 181 Ill. 73, the only
existing, unimpeached, actual decision found, in which the power
of the legislature to control the matter of admission to practice
has been denied, on the ground of mere inherent, natural, ex-
clusive power in the courts. The New Jersey cases do not assert
it. *Attorney's License,* 1 Zab. (21 N. J. L.) 346, says not a word
on the subject. *In re Branch,* 70 N. J. L. 537, involved neither
license nor admission, but only the duty of the court to certify
to the governor educational qualification of certain persons to
enable them to obtain licenses from the governor. The court
held that the examination and recommendation of applicants
belonged exclusively to the court, not because of any natural or
inherent right, nor because it was necessary to the preservation
of the separation of judicial from legislative power, but because
the constitution had expressly vested exclusive control thereof
in the supreme court. Concisely stated in the court's own lan-
guage, the proposition is: "The supreme court of New Jersey
neither licenses attorneys-at-law nor admits them to practice.
They are invested with that privilege by letters-patent, issued
by the governor of the state when he is assured that such licensees
are possessed of the proper qualifications by a recommendation
to that effect from the supreme court, based upon an examina-
tion made by it or under its supervision, which examinations so
made or supervised has, from the earliest periods, been a dis-
tinctive attribute of the supreme court, and as such existed in
unqualified form at the time the constitution of 1844 was
adopted. The power of the supreme court thus to examine, for
itself, those whom it recommended, for license, was therefore one
of those 'powers' which, in addition to its 'jurisdiction,' it was

by that instrument authorized to 'continue.' Assuming the continuance of such mode of appointment, a statute, passed in 1903, requiring the supreme court to recommend certain individuals without such an examination, is an unauthorized exercise of legislative control." That case does not even countenance the doctrine of the Illinois court. In taking shelter under an express constitutional provision, it impliedly denies and repudiates the idea of inherent power. The Indiana cases enunciate no such doctrine. Not a word on the subject is found in *Garrigus* v. *State,* 93 Ind. 239. In *In re Leach,* 134 Ind. 665, the exact opposite is asserted, for the court, after saying attorneys are subject to the rules of practice in court, and that the power of courts to control their attorneys is inherent, added "such rules, of course, not conflicting with the constitution and laws of the state." This is an express acknowledgment of legislative supremacy, and I do not see how my brethren can cite the case for the opposite contention. In *O'Brien's Petition,* 79 Conn. 46, the applicant contended, nor that there was inherent power in the courts to grant licenses or admit to practice, beyond legislative control, but that a statute, expressly committing to the courts the matter of admission upon examination by a committee of the bar, was unconstitutional because it required examination by mere members of the bar instead of by some officer; but the court upheld the statute and thereby recognized legislative authority in the premises. To the weight of this lack of authority for the proposition, underlying the majority opinion, there is to be added that of the following cases, expressly declaring the contrary: *Ex-parte Yale,* 24 Cal. 241, saying "The manner, terms, and conditions of an attorney's admission to practice, as well as his powers, duties and privileges, are subject to legislative control, the same as any other profession or business that is created or regulated by statute;" *Cohen* v. *Wright,* 22 Cal. 293; *In re Hovey,* 80 Pac. Rep. 234; *Champion* v. *State,* 43 Tenn. (3 Cold.) 111, declaring "An attorney, before he is permitted to practice law in this state, must, in open court, take an oath to support the Constitution of the United States, and the state of Tennessee, and to faithfully demean himself in the practice of his profession, &c. No court has the right to affix other conditions, than those imposed by law"; *In re Application for License,* 143 N. C. 1, holding that "The legis-

lature has the right to establish the qualifications to be required of one to become a practicing member of the bar by virtue of the police power which is vested in that body"; and *In re Hovey,* 81 Pac. Rep. 1019, declaring "The finding of a referee appointed to ascertain and report as to moral character of applicant for admission to the bar that the applicant was of good moral character prior to his arrival in the state, and that he was then guiltless of crime or improper conduct as an attorney, is conclusive." It is a just criticism upon the decision in the *Day Case,* 181 Ill. 73, to say. the historic facts, relating to the admission of attorneys, which compelled the New York court of appeals to overrule one of its decisions, and drove the supreme court of New Jersey to the shelter of an express constitutional declaration of exclusive power in itself, are all admitted and either denied any force whatever or given a significance diametrically opposite to that accorded them by the New York and New Jersey courts and its authority and reasoning were repudiated in the North Carolina case.

There could not have been any such exclusive power in the courts at common law. The power of the British Parliament was supreme. It could dethrone the King and did so. It could destroy the courts and replace them with others of its own creation, and has done so. Judge Cooley, in his treatise on Constitutional Limitations, pp. 124 and 125, says the parliament can do everything that is not naturally impossible, wherefore some have not scrupled to call its power, by a figure rather too bold, the omnipotence of parliament; and quotes Sir Matthew Hale as having said "This being the highest and greatest court, over which none other can have jurisdiction in the kingdom, if by any means a misgovernment should any way fall upon it, the subjects of this kingdom are left without all manner of remedy;" and Lord Burleigh as having said "That England could never be ruined but by a parliament." Of course our legislatures have no such power, but they do have all the sovereign power not vested by express constitutional provision in the other two departments, the executive and judicial. Judge Cooley says, at page 126: "In creating a legislative department and conferring upon it legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any

country, subject only to such restrictions as they have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at its discretion." This means that the legislature possesses all sovereign power, not expressly or by necessary implication vested in the other two departments. It is the successor, in logic, of the British Parliament, except in so far as certain powers exercised by parliament have been carved out and lodged in the other two departments. This principle was recognized by the New Jersey court when it based its exclusive authority to recommend applicants for license to practice law upon the constitutional provision of that state, declaring the powers and privileges of the supreme court should continue, but entirely overlooked in the Illinois case, to which reference has been made. Our own Constitution impliedly says there is jurisdiction in the legislature to regulate and control the exercise of judicial power. Section 39 of Art. VI says the legislature shall not pass local or special laws in any of certain enumerated cases, one of which is described as follows: "Regulating the practice in the courts of justice." The constitution goes no further than to vest the judicial power in certain courts by it created and certain others which the legislature is allowed to create, and then the regulation of the practice and procedure of the courts is left in the power of the legislature. The common law practice, except in so far as it had been repealed or modified by legislation, was left in force until the legislature should alter it. Even now, this Court is operating under certain statutes, governing its practice, that are not conducive to the best results for the public, nor the convenience of the Court. On the contrary, some of these regulations are inconvenient and materially impair the efficiency of the Court, by reason of delays and lack of system and order. But I apprehend it would strike the people of this State as novel, arbitrary, or possibly tyrannical, if we should refuse obedience to those laws and transact business in accordance with our own notions of expediency, wisdom and justice. Again, it is to be observed that the selection of the personel of the court, the judges, is not and never was judicial. It has always been executive or legis-

lative.  Since the people are entrusted with the selection of the judges who preside in the courts, the real administrators of justice, and the legislature can prescribe all the rules of procedure, and the judges are bound to respect and obey them, let them impair the efficiency of the court or not, it strikes me as a strange doctrine that attorneys, who have no judicial power and are the mere representatives of their clients, stand upon an infinitely higher and superior plane, beyond the reach of the people through lgislative power, and are responsible to the courts alone for their origin and rights.  For this position, we have the high authority of the Supreme Court of the United States in *Ex-parte Garland*, 71 U. S. 333, 380, declaring "The legislature may undoubtedly prescribe qualifications for the office (of attorney) to which he must conform, as it may, where it has exclusive jurisdiction, prescribe qualifications for the pursuit of any of the ordinary avocations of life."

It is always proper to look to the possible consequence of the determination of any question, as having some bearing upon the correctness thereof.  If the courts have exclusive power to say who shall and who shall not be attorneys and what qualifications they shall possess, and the legislature can exercise no power in this respect, that the courts are bound to submit to, the latter can raise the standard of educational, social and moral qualifications to such an extent as to exclude all but a few of the great body of citizens from the legal profession, and there is no power in the state that can prevent it.  They could exclude women, the colored citizen, all male citizens who have not acquired the highest possible educational attainments, all but Methodists, or Baptists, or Presbyterians, or Catholics, or any other class.  Gentlemen composing the bench and bar, and clothed with such absolute power, could soon make themselves a very select and exclusive class of citizens, from which worthy and competent men would be barred out on fanciful pretexts, bearing no just or reasonable relation to the nature or efficiency of the profession.  There would be no limit to their arbitrary power.  They might come in contact with some of the late amendments to the Constitution of the United States, but the state is not supposed to look to them as factors in the determination of its own domestic policy, except as a limitation upon its powers.  There was a time when these amendments did not

exist and they may cease to exist in the future. The constitution of the state has set no limitation upon the powers of the court in respect to the admission and disbarment of attorneys, and if the legislature has no power of control in that behalf, there is none and they may do what they please. It is not to be presumed, of course, that any such radical, unreasonable and unjust measures as those mentioned will ever be adopted, but the framers of the constitution attempted to cover and provide for possibilities as well as probabilities. That instrument was made not merely for ordinary conditions and circumstances, but for times when conditions may be extraordinary and, for some reason, passion and prejudice and conflict of interest might attempt to obtrude themselves even into the courts. Such calamities, should they befall us, would be remediable by a constitutional amendment, of course, but should we adopt a construction which makes possible the necessity of resort to so drastic a remedy, one in the nature of a revolution? If the power to regulate this subject is left in the legislature, ultimate and substantive rights, respecting the profession will be recognized as having originated in positive law, like those of other people, and be subject to the control of that branch of government to which the members of all other professions have to subordinate their interests and aspirations.

Having thus examined all the decisions, relied upon to sustain the supposition of exclusive power in the courts, in the light of legal principles, our system of popular government, and considerations of public policy, I am thoroughly convinced that, in so far as they assert the doctrine, they are founded upon mere sentiment and over-zealousness for the interests of the profession, mistaken for reason and law, and accord to the courts a power far in excess of means necessary to preserve and maintain the efficiency of the judiciary. Stilted exclusiveness and puritanical fastidiousness may be desirable and pleasant to bench and bar, but are not at all necessary to the due administration of justice, nor accordant with the spirit of our institutions.

Justification for the position taken in the majority opinion is sought in those decisions which say the function of admitting and disbarring attorneys is judicial. These enunciations do not imply what is claimed for them. In *Walker* v. *State,* 4 W. Va. 749, *State* v. *McClaugherty,* 33 W. Va. 250, *State* v.

*Stiles,* 48 W. Va. 425, *State* v. *Shumate,* 48 W. Va. 359, *State*
v. *Hayes,* 64 W. Va. 45, *Ex-parte Secombe,* 19 How. 9, *In re
Garland,* 71 U. S. 333, and *Ex-parte Wall,* 107 U. S. 265, the
judicial nature of the proceeding was adverted to or recognized
as either justifying or precluding the remedy, invoked in the
appellate court, and nothing more.   Nowhere is it said that the
judicial character of the proceeding places the matter of right
to practice or right to be retained in the court beyond the legis-
lative power.   In the *Secombe Case,* application was made in
the Supreme Court of the United States for a *mandamus* to
compel the supreme court of the territory of Minnesota to set
aside an order entered by that court, removing Secombe from
his office as attorney and prohibiting him from practicing his
profession in any of the courts of that territory.   The Supreme
Court of the United States said no more than that, both at
common law and under the statute of the territory of Minnesota,
the admission and disbarment of attorneys was a judicial act,
and, for that reason, a *mandamus* could not be awarded to review
the action of the territorial court.   The statement of the nature
of the proceeding was made for no other reason than to show
that *mandamus* was not the proper remedy for review.   We
have held over and over in this Court that *mandamus* cannot
be substituted for a writ of error, and that is substantially all
the Supreme Court of the United States decided in the *Secombe
Case,* in which the principle was applicable.   Our own cases,
entertaining writs of error in proceedings of that kind, are pre-
cedents and authorities for the proposition that a writ of error
lies and is the proper remedy to review a judgment of disbar-
ment, because it is judicial and not administrative, and that is
the only reason for saying the function is judicial.   The *Cooper
Case,* in 22 N. Y. 67, well illustrates the fallacy of the argu-
ment of the majority opinion.   It says the admission of at-
torneys is a judicial and not an executive function.   Thereby
it justifies an appeal to the court of appeals.   Then it proceeds
to say and decide that the legislature has power to determine
the conditions upon which persons shall be admitted, and these
two propositions are not inconsistent.   In that case Judge Selden
said, after reviewing the English and early New York law,
"It follows from what has been said, that unless the constitu-
tion of 1846 has either expressly or impliedly conferred upon

the supreme court, or upon the several courts, the exclusive power claimed in this case, the whole subject of the admission of attorneys and counsellors was left as theretofore in the hands of the legislature, subject only to the constitutional provisions bearing upon it." Then after reviewing the reasoning of the judge of the court below, he continued: "In this, the judge no doubt is correct; but his inference that the power thus exercised by the supreme court is thus established so as to be beyond the control of the legislature is plainly erroneous. * * * The legislature has not taken from the court its jurisdiction over the question of admission, but it has simply prescribed what shall be competent evidence in certain cases upon that question. * * * No doubt some kind of formal admission was contemplated; but so far as I can see, that admission, under the provisions of the constitution, may as well have been by the governor, the attorney general, or any other public functionary, as by the courts. There was a propriety, certainly, in investing the court with the power, as the legislature has done; but this was a question of mere legislative discretion." The judicial character of the function of the court below, in refusing admission on the theory that the legislative act was unconstitutional, as invading the powers of the judiciary, was declared by the court of appeals as the basis of an appeal to enable that court to declare the judgment of the lower court erroneous, in holding that the legislature had no power to say who should be admitted to practice law. The court of appeals said the court below had acted judicially in passing upon the sufficiency of the evidence of certain facts and the constitutionality and validity of a statute, in acting on the application for admission. It did not say the creation of the right to admission was judicial. The inference of exclusive power in the courts, respecting the rights of attorneys, from the character of the function performed by the court in admitting or expelling them, is a confusion of right with remedy. The question we have here is not one of remedy, but of the source or origin of the right to be an attorney and practice in the courts. The function of the judiciary is to ascertain, declare and enforce rights given or created by the common law, statutes or the constitution, rights created, not by the judiciary, but by some other power. The origination or creation of rights, whether personal or prop-

erty, is no part of the judicial function. Its powers are to administer and enforce, not to make, laws. We have shown that, in the first instance, this right was conferred by the King and then by statute and never by the courts out of any inherent power possessed by them. They merely recognized and enforced it. In determining whether a person is heir, distributee, devisee or a legatee of an estate, the court acts judicially, but it would be absurd to say it creates the title or right of heir, distributee, devisee or legatee. The court acts judicially in passing upon the constitutionality of statutes and in construing them, but who would infer from that a claim of right on its part to pass statutes? The court acts judicially in rendering a judgment in favor of a creditor for money or an owner of land for possession thereof and in decreeing specific performance of a contract, but who would say, for that reason, that it creates the debt or gives title to the land or makes the contract of the parties? The inference is an absolute *non sequitur*. It should be the exact opposite. That the function is judicial implies the existence of a right in the attorney beyond the arbitrary or discretionary power of the court, a right originating in, and springing from, a source outside of the court, a right guaranteed by law so the court cannot take it away or deny it, except upon a hearing and for cause.

Another serious misapprehension, entering into the reasoning and conclusion of the majority opinion, is the failure to distinguish between a license and admission. All of the decisions relied upon, for the controlling proposition of that opinion, were rendered in cases of application for admission, except the case in 70 N. J. L., and that was not an application for a license. It was an application for a certificate or recommendation to the governor as the basis of an application to him for a license. To say there is no difference between an application for a license and one for admission is to contradict the solemn, emphatic and deliberate decisions by which we are bound. *Fisher's Case,* 6 Leigh 619; *State* v. *McClaugherty,* 33 W. Va. 250. To say the Court can do, in respect to a license, what it can do, concerning an application for admission, or by way of disbarment, is to assert the exact contrary of what those decisions say. They declare that a license cannot be taken away by summary proceedings nor at all but for the causes and in the manner speci-

fied in the statute. Because an informal proceeding and immorality suffice to debar or disbar an attorney, it is assumed that they justify refusal of a license, and that in the face of decisions which say the license, if granted, could not be revoked, suspended or annulled in any such manner nor for any such cause. The applicant here is denied a license for a reason which would not be sufficient cause for revoking it, if it had been granted, upon the fallacious and indefensible notion that license and admission are equivalent things.

None of the decisions, relied upon in the majority opinion are authority for the position that the granting of a license to practice law is a judicial function. They say admission and disbarment are judicial functions, but not that the granting of a license is, and we have shown that the two things are not the same. Our legislation on the subject of licenses to practice law indicates that the granting thereof is a purely ministerial function. Never, until 1897, was the granting of a license to practice law made the duty, or committed into the power, of any court. For more than a hundred years the duty had been imposed upon judges, acting in vacation, and no record of their action in granting the same was made in their courts. It was purely a ministerial matter. They examined the applicants and acted upon their own individual judgment as to whether they had sufficient professional attainments or qualifications, and never looked beyond the order of the county court as to age, residence or character. The power was not exercised by any court, but only by judges off of the bench and in obedience to, and by authority of, an act of the legislature. Nothing in the statute required or authorized them to look beyond the certificate of the county court. Their authority in the premises was purely statutory and the statute stopped short of any inquiry back of that certificate. They could not have had any common law power to do so, for they were not acting in any common law capacity, not as courts, but as judges. Now, what sort of a power was that and whence its emanation? How can it be said to have come from a court, when no court had anything to do with it? How can it be said not to have come from the legislature, when it all sprang from the legislature and not elsewhere? The act of 1897 simply transferred this power from the three judges to this Court, without any indication of any

intent whatever to change the nature or character of it. How can it be said now to be different in nature and character from what it was when exercised by individual judges? There is an assumption in the majority opinion, that, in requiring no more evidence of moral character, age and residence, than the certificate of the county court, the legislature has not sufficiently provided for the integrity and purity of the profession, and that, therefore, it devolves upon this Court to interpose further safeguards. It is elementary that courts cannot review, revise or amend legislative acts, because, in their opinion, such acts do not embody the peculiar notions or views of the courts concerning expediency, policy and wisdom. If this Court is now the guardian of the legal profession, authorized to exercise powers as such by refusing licenses, after the applicant has complied with all the statutory requirements, let me ask who held that office and performed its functions during that century in which neither the courts of last resort of this State and Virginia, nor any other court, except the county court, had any power, or was charged with any duty, respecting the granting and refusal of licenses? The fact that nobody, for more than a hundred years, nor until now, in all the history of the state, ever lodged a protest in any court against the granting of such a license, and that in respect to integrity and purity, the legal profession of this State compares favorably with those of other states and the country at large, argue strongly that, in the opinion of both bench and bar, there never was any such guardian, and, in that of the legislature and the people of the state, that there was no occasion for any. This Court and every other court in the State, by its power of amotion, or disbarment or striking from the roll, has been abundantly able to keep its bar purged of unworthy persons, and that has been, in the opinion of the legislature and of the courts, ample protection from contamination, impurity and incompetence. It was very wisely determined at an early day that the time of the superior courts ought not to be consumed with such inquiries as the one raised here by this protest, and for that reason the question of moral fitness of the applicant was left to the judgment of the representatives of his own county, and I think there was no lack of power in the legislature to refer it to them, and make their finding conclusive for the purpose of the application for a license.

Whether a licensee can be denied admission, for any cause antedating the certificate from the county court as to his age, residence and moral character, or as to whether such a certificate, fraudulently or irregularly procured, can be invalidated I do not take the time to inquire, deeming it wholly unnecessary for the purposes of this case, and as having no important bearing upon the question now under consideration. If the legislature sees fit to make the certificate conclusive not only for the purpose of obtaining license, but also for the purpose of obtaining admission, in respect to all matters antecedent to the date of such certificate, I have not the slightest doubt of its power to do so. If it has done so, it does not follow that the courts cannot disbar for misconduct after admission. If, by accident, an immoral man should thus get into the profession, the continuance of immoral conduct thereafter would justify his disbarment, and the power to exclude him would be amply sufficient to protect the courts from any serious injury or embarrassment.

The statute declares a right in favor of a citizen. It says that, upon compliance with certain conditions, the court may grant a license to any citizen of the state. The applicant here has complied with every one of them. That vests in him a right *de jure,* in law, for the legislature is competent to give it and has done so. It is to be read as if it said any citizen may have a license, upon compliance with the conditions imposed. It follows that the Court cannot withhold it. To say the right is not given and is not *de jure* is simply to confound license with admission, a matter in respect to which the legislature may not have restrained the judicial power. In my judgment, the authorities cited in the majority opinion, call for the reading of "may" in this statute as if it were "must." To these a great many others could be added.

For these reasons, I would reject the protest and all the evidence, offered in support of its charges, and grant the license.

BRANNON, JUDGE:

I concur with Judge POFFENBARGER.