NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0607n.06
Filed: August 21, 2007

No. 06-4388

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CARROLL L. JENSEN, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| MOORE WALLACE NORTH AMERICA, | ) | NORTHERN DISTRICT OF OHIO |
| INC., et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: CLAY and SUTTON, Circuit Judges; and GREER, District Judge.*

SUTTON, Circuit Judge. Seeking to recover a $200 million surplus from a pension plan that the defendants sponsor, the plaintiffs—present and former plan participants—filed this class-action lawsuit. The district court dismissed the complaint under Civil Rule 12(b)(6). Because the defendants have not yet terminated or discontinued the pension plan and because the wasting-trust doctrine does not apply, we affirm.

I.

In 1947, Moore Wallace North America, Inc., currently a subsidiary of R.R. Donnelley & Sons Company, established the Retirement Benefit Plan of Moore North America, a defined-benefit

---

* The Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.

No. 06-4388
*Jensen v. Moore Wallace N. Am. Inc.*

pension plan, which Moore Wallace and its employees funded through their contributions. *See Comm'r v. Keystone Consol. Indus. Inc.*, 508 U.S. 152, 154 (1993) (a defined benefit plan is "one where the employee, upon retirement, is entitled to a fixed periodic payment," the size of which is usually determined by "prior salary and years of service"). JA 8. Article 23 of the 1947 plan, entitled "Finality of Contribution," said:

> It shall be impossible by operation of the plan, or of the trust agreement, by termination, by power of revocation or amendment, by collateral agreement, by the happening of any contingency, or by any other means, for any part of the corpus or income of the trust fund to be used for or diverted to purposes other than the exclusive benefit of active participants, inactive participants and retired participants, or their respective beneficiaries, at any time prior to the satisfaction of all liabilities with respect to such participants or their beneficiaries and it shall be impossible for the Company to recover any amounts other than such amounts as remain in the trust because of erroneous actuarial computations after the satisfaction of all fixed and contingent obligations to participants or their beneficiaries under the plan.

1947 Plan, art. 23.1. Although Moore Wallace "reserv[ed] the right to amend or modify any of the provisions of [the] plan," the plan provided that "no such amendment or modification shall reduce any benefit which may have accrued to any participant and which shall have been funded prior to the date of such amendment . . . nor shall any such amendment have the effect of revesting in the Company any part of the trust fund or of diverting it to purposes other than the exclusive benefit of active participants, inactive participants and retired participants or their respective beneficiaries." *Id.*, art. 21.4.

"In the event of discontinuance or termination," the plan mandated that any remaining trust funds be liquidated and distributed to participants on a pro rata basis. *Id.*, art. 21.3. "Discontinuance

- 2 -

or termination," the plan said, "shall not revert in the Company any right to any part of the sums theretofore contributed by it." *Id.*, art. 21.2. The employee handbooks that Moore Wallace provided to its employees reiterated that in the "event of termination of the Plan, all funds and Insurance-Annuity Contracts then held by the Trustee will be distributed to the participants and their beneficiaries." JA 100; *see also* JA 101 (handbook stating that "[i]t will be impossible under any circumstances for any part of the funds or Insurance-Annuity Contracts held by the Trustee to revert to or become the property of the Company").

This anti-reversion language remained part of the plan until 1972, when Moore Wallace removed the provisions preventing it from recapturing surplus funds and replaced them with a provision granting the company the right to any surplus. *See* 1972 Plan, § 15.2 ("If any of the funds of the Plan remain after the satisfaction of all liabilities of the Plan, the said remaining funds shall be paid by the Trustee to the Employer."). The company also eliminated the pro-rata distribution procedure contained in the original (1947) plan, providing instead that plan participants would receive only the amount allocated specifically for them, *id.*, and it amended the plan to permit contributions only by the employer, not employees, *id.*, § 5.1 ("No contributions are to be made by Participants under the Plan.").

In July 1997, Moore Wallace restructured the plan, changing it from a defined-benefit plan to a cash-balance plan. *See West v. AK Steel Corp.*, 484 F.3d 395, 399 (6th Cir. 2007) ("Like defined contribution plans, . . . a cash balance plan creates an account for each participant. But unlike traditional defined contribution plans, the account is hypothetical and created only for recordkeeping

purposes."). Under the 1997 plan, "Grandfathered Participant[s]" could continue accruing benefits under the 1947 plan's defined-benefit framework, or they could freeze the benefits they already accrued under the 1947 framework and accrue future benefits under the amended plan's cash-balance framework. 1997 Plan, § 19.5. Grandfathered participants included (1) employees age 65 or older, (2) employees age 50 or older with 10 or more years of experience with the company and (3) individuals age 45 or older with 20 or more years of experience with the company who were employees on December 31, 1997. *Id.* § 19.1(c). Employees who did not fit into any of these categories could obtain benefits only under the 1997 amended cash-benefit plan. Moore Wallace made no contributions to the plan after 1996.

On December 11, 2000, Moore Wallace amended the plan again, providing that "[n]o further retirement benefits . . . shall accrue under the Plan on behalf of any Participant after December 31, 2000." JA 239. Shortly thereafter, the company sent a letter to retirees to inform them that the company was "changing the structure and delivery of [its] total benefit offering" from a pension plan to a savings plan and that the pension plan would terminate on December 31. JA 241. In January 2001, Moore Wallace informed participants that it instead expected to terminate the plan on March 31 of that year. The company also supplied participants with a written question and answer statement regarding the plan's termination. The statement explained that the company "expected that there [would] be surplus assets when the termination of the Retirement Plan is complete," but noted that the "precise amount of the surplus [could not] be determined at this time because it

depend[ed] on several factors" and that the surplus would "be used for the successor plan (401K), income and excise taxes" with "the balance reverting to Moore." JA 248.

On February 7, Moore Wallace amended the plan to authorize the company to buy annuities for participants. The following day, the company's vice president of human resources sent a letter to participants, telling them that the termination would not occur as scheduled. "The new management team," the letter said, was "reassessing [the termination] as part of [its] overall plan to reposition the organization in the best interests of [its] shareholders, customers and employees." JA 256.

During March, Moore Wallace purchased annuities "representing approximately 70% of all defined benefit liabilities under the Plan." Complaint ¶ 57. On April 2, the company notified participants whose benefits had not been fully annuitized that it intended to terminate the plan on June 4, 2001 and confirmed the termination date in a "commonly asked questions" document provided to participants. On April 12, Moore Wallace formalized its intent to terminate the plan on June 4 through an amendment. The next day, the company asked the IRS, in connection with the proposed termination, for a tax determination to the effect that the plan was an ERISA-qualified plan. *See* 29 C.F.R. § 4041.25(c). On November 30 of that year, Moore Wallace also filed a standard termination notice with the Pension Benefit Guaranty Corporation (PBGC). *See* 29 U.S.C. § 1341(b)(2)(A); 29 C.F.R. § 4041.21(a)(3).

When, after several years, the IRS failed to provide a "favorable determination letter," Moore Wallace changed course. JA 274. On May 14, 2004, it notified retirees with annuitized benefits that the company would not terminate the plan. The company assured the former participants with annuitized benefits that "the decision to withdraw [the] request to terminate the Plan [would] have no effect" on them. JA 274.

On December 22, 2004, the plaintiffs—former and current plan participants—filed a class-action lawsuit in federal district court against Moore Wallace, R.R. Donnelley & Sons Company and the Retirement Income Plan of Moore North America, Inc., seeking a declaration that Moore Wallace's actions terminated the pension plan, entitling them to the surplus assets of roughly $200 million. *See* 29 U.S.C. § 1132. They also asked for a declaration that they, not the company, were "entitled to all residual assets remaining in the Plan fund following the termination." Complaint ¶ 67. The plaintiffs also sought to enjoin Moore Wallace from "taking any actions" that would rescind the plan's termination or would liquidate the pension-plan trust, insisting that the company had "created a wasting trust," thus rendering "termination or discontinuance of the Plan . . . irrevocable." *Id*. ¶¶ 62, 65.

Moore Wallace filed a motion to dismiss the plaintiffs' complaint. *See* Fed. R. Civ. P. 12(b)(6). Concluding that the factual allegations in the complaint did not show that the plan had terminated and determining that the wasting-trust doctrine could not save the plaintiffs' claims, the district court granted the motion.

No. 06-4388
*Jensen v. Moore Wallace N. Am. Inc.*

II.

In giving fresh review to the district court's dismissal of a complaint under Civil Rule 12(b)(6), *Morrison v. Marsh & McLennan Cos., Inc.*, 439 F.3d 295, 300 (6th Cir. 2006), we accept the plaintiffs' allegations as true and may affirm the dismissal "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

A.

Relying on the terms of the 1947 plan, plaintiffs argue that Moore Wallace's actions starting in 2000 "terminat[ed]" or "discontinu[ed]" the pension plan, triggering the company's obligation to liquidate the trust and to distribute the proceeds to participants on a pro-rata basis. *See* 1947 Plan, art. 21.3. On appeal, plaintiffs do not press the first theory of liability, and there is a good reason why. Not only did Moore Wallace never finally "terminat[e]" the plan under any conventional meaning of the term—30 percent of the pre-2000 participants still receive benefits under the plan—but, since 1974, the Employee Retirement Income Security Act (ERISA) has governed the procedure for "terminat[ing]" a pension plan and preempted contrary methods for doing so. *See* 29 U.S.C. § 1341(a)(1) (ERISA is the "[e]xclusive means of plan termination."); 29 C.F.R. § 4041.1; *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999) (explaining that ERISA supplies the "sole avenues for voluntary termination" of a plan).

To satisfy ERISA's requirements for terminating a pension plan, the plan administrator must (1) issue to "affected part[ies]" a "written notice of intent to terminate," which includes the "proposed termination date," 29 U.S.C. § 1341(a)(2); *see also* 29 C.F.R. § 4041.21(a)(1); (2) issue "notice to each person who is a participant or beneficiary under the plan . . . specifying the amount of the benefit[s]" to which the individual is entitled, 29 U.S.C. § 1341(b)(2)(B); *see also* 29 C.F.R. § 4041.21(a)(2); (3) file a standard termination notice with the PBGC, 29 U.S.C. § 1341(b)(2)(A); *see also* 29 C.F.R. § 4041.21(a)(3); and (4) distribute the plan assets, 29 U.S.C. § 1341(b)(2)(D); *see also* 29 C.F.R. § 4041.21(a)(4). The administrator has 180 days from the expiration of the PBGC's 60-day review period, *see* 29 C.F.R. § 4041.26(a), to distribute the assets, *see id.* § 4041.28(a)(1). But if, prior to filing the termination notice with the PBGC, the administrator seeks a request from the IRS for a determination of the plan's tax-qualification status upon termination, ERISA extends the asset-distribution deadline to 120 days *after* the IRS provides a favorable determination. *Id.*

Moore Wallace did not satisfy all of these requirements. The plan administrator requested a determination letter from the IRS on April 13, 2001. But it never received a favorable determination from the IRS, abandoned its termination plans after waiting fruitlessly for a response from the IRS for several years and thus never completed the fourth step of an ERISA-authorized termination—the distribution of plan assets. Because Moore Wallace failed to complete all of the steps that ERISA requires for plan termination, that eliminates as a matter of law any possible claim plaintiffs might have stemming from a termination.

Apparently recognizing this defect in their cause of action, plaintiffs on appeal no longer press their claim that a "termination" occurred but instead contend that Moore Wallace "discontinu[ed]" the plan, triggering the same pro-rata distribution of plan assets that follows a "termination." *See* 1947 Plan, art. 21.3. This theory, however, faces some of the same problems as their "termination" theory of liability—and at least one more. Just as there is no linguistic basis for saying that a company has terminated a plan—when it still provides participants with benefits under the plan and, for the time being, has abandoned plans to wind up the plan—so there is no conventional basis for saying that the company has discontinued the same plan. The 1947 plan document on which plaintiffs rely did not refer to a partial discontinuance (or partial termination) or an intended discontinuance (or intended termination), but to a discontinuance (or termination), plain and simple. Under any recognizable definition of that term, a company does not discontinue a plan when it continues to provide benefits under it.

Under the 1947 plan, moreover, either a discontinuance or a termination requires the company to distribute its plan assets, *see id*., which also happens to be the last defining event of an ERISA plan termination, 29 U.S.C. § 1341(b)(2)(D); *see also* 29 C.F.R. § 4041.21(a)(4). Plaintiffs offer no reason why Congress would wish to establish an "[e]xclusive means of plan termination," 29 U.S.C. § 1341(a)(1), that could be circumvented by the simple expedient of labeling the winding up of the plan a "discontinuance." Nor can we think of one.

Nothing we have said, it bears adding, precludes plaintiffs from pursuing any surplus-asset claim they may have arising from a "termination" of the plan once that indeed occurs. Until then,

however, they have no more right to insist on the termination of the plan and the distribution of its assets than the company would have before it followed ERISA's plan-termination prescriptions.

B.

The plaintiffs also urge us to apply the wasting-trust doctrine to Moore Wallace's plan and order plan administrators to terminate the trust. A wasting trust is one "whose purposes have been accomplished, such that the continuation of the trust would frustrate the settlor's intent." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999). An initial stumbling block to plaintiffs' claim is that the Supreme Court has shown little inclination to apply the doctrine in the context of pension-plan terminations, reasoning that the "[a]pplication of the wasting trust doctrine . . . would appear to be inconsistent with the language of ERISA's termination provisions." *Id.* That admonition makes considerable sense: Why would Congress establish a highly reticulated, national and "exclusive" set of rules for terminating pension plans if state and federal courts could terminate those same plans whenever it appeared that the "continuation" of the plan "would frustrate the settlor's intent"?

Even by its own terms, at any rate, the wasting-trust doctrine does not apply here. As plaintiffs acknowledge, Moore Wallace has annuitized just 70 percent of the plan participants, meaning that 30 percent of the plan participants still actively draw benefits under the plan. For these remaining plan participants still drawing pension benefits, the plan assuredly has not accomplished all of its purposes.

III.

For these reasons, we affirm.