718 S.E.2d 784 (2010)
STATE of West Virginia, ex rel. Jennifer BAKER, Janet Horner, Sharon Hendershot, Barbara Johnson, Tanya Manley, Helen Miller, Christine Mullen, Ruth Smith, Bernice Stotler, Dee Ann Stotler, Linda Stotler, Barbara Yost, Carol Layton, Nancy Waugh, and Terry Kesecker, Plaintiffs Below, Appellees,
v.
MORGAN COUNTY WAR MEMORIAL HOSPITAL, by and through MORGAN COUNTY WAR MEMORIAL HOSPITAL BOARD OF DIRECTORS, John H. Borg, and Valley Health Systems, Inc., Defendants Below, Appellants.
No. 35298.
Supreme Court of Appeals of West Virginia.
Submitted April 14, 2010.
Decided June 15, 2010.
*786 Richard G. Gay, Esq., Nathan P. Cochran, Esq., Law Office of Richard G. Gay, Berkeley Springs, WV, John Baldwin, Esq., Pro Hac Vice, Baldwin Law Group, Towson, MD, for Appellants.
Lawrence M. Schultz, Esq., Mark Jenkinson, Esq., Burke, Schultz, Harman & Jenkinson, Martinsburg, WV, for Appellees.
PER CURIAM:
In this appeal from the Circuit Court of Morgan County we are asked to examine an order that interpreted a pension plan and a board of directors' resolution terminating that plan. The circuit court entered a partial summary judgment order finding that the resolution unambiguously terminated the plan, and finding that the plan's language requires any surplus assets in the pension plan to be distributed to the plan's participants (after all of the plan's liabilities have been satisfied).
After careful consideration of the record and the briefs and arguments of the parties, we affirm the circuit court's partial summary judgment order.

I.

Facts and Background
Appellant Morgan County War Memorial Hospital ("the hospital") is a county-owned hospital in Berkeley Springs, West Virginia. It has 41 beds and approximately 180 full- and part-time employees.
In 1972, the hospital created a defined benefit pension plan for its employees. The hospital made routine contributions into the pension plan. Later, retired employees could receive pension benefits from the plan calculated according to a formula based upon each employee's salary and years of service. The parties agree that because the pension plan is a "governmental plan" for a county-owned hospital, rather than a privately-owned pension plan, it is exempt from the statutory requirements of the Employment Retirement Income Security Act of 1974 ("ERISA").
In 1987, the hospital "froze" the defined benefit pension plan.[1] No additional employees were allowed to participate in the plan, and existing participants could not accrue any additional benefits. The names of the employees who were covered by the pension plan, and their years of service, were recorded. Since 1987, the majority of the employees in the hospital's defined benefit pension plan either quit, died before receiving any benefits from the plan, or retired and are receiving a fixed benefit according to the terms of the plan. As of 2009, the parties estimated that only 16 active employees were covered by the frozen defined benefit pension plan. The appellees (and plaintiffs below) are 15 of these 16 remaining employees, and are hereafter referred to generally as "the employees."
The hospital's contributions into the defined benefit pension plan were invested and reinvested over the years. By 2005, the assets in the plan had grown to $817,262.00. However, it appears that under the plan's formula, each employee is only entitled to receive a monthly retirement benefit of about $50.00 to $250.00 per month. An actuary calculated that the total, current cost to buy annuities to provide a vested, fixed monthly retirement benefit to all of the employees covered by the plan, for the remainder of their lives, was only $142,911.00. Put another way, as of 2005, the actuary calculated that there was a surplus in the plan of $674,351.00.
*787 The instant case centers on who, between the hospital and the employees covered by the plan, is entitled to ownership of the surplus in the defined benefit pension plan.
At some point in 2002, the hospital conceived a plan to terminate the defined benefit pension plan, to then set aside sufficient assets to pay its retirement obligations to its employees, and to then use the plan's surplus to (ostensibly) construct a new hospital building. The plan, as written by the hospital in 1972, specified several ways to terminate the plan, including "by resolution of the Employer's Board of Directors[.]"[2]
In February 2004, the hospital's board of directors adopted a resolution terminating the 1972 defined benefit pension plan. The resolution stated that, once the Internal Revenue Service ("the IRS") issued a favorable letter indicating that the termination was acceptable under federal tax laws, the plan's surplus would be returned to the hospital.[3] The hospital's resolution specifically states that "the Plan is terminated[.]" Neither the plan nor the February 2004 resolution stated that approval of the employees or the IRS was required to terminate the plan.
Nevertheless, the hospital sought approval from the IRS and requested a ruling that the hospital could use the plan's surplus without tax consequences. The IRS responded by asking the hospital "whether there is reversion language in the plan" that would allow the hospital to take control of the surplus.
In a letter dated June 8, 2005, the hospital told the IRS that it would "like to adopt an amendment to the plan to provide for the reversion of surplus assets" to the hospital. The letter went on to state:
We have been advised by the hospital's local counsel that West Virginia contract law would allow for the amendment of the plan if all participants provide their consent to the amendment after being informed of the consequences of the amendment. In preliminary conversations with the participants, all have agreed to provide their consent to the amendment.
On October 6, 2005, the IRS issued a letter to the hospital ruling that the hospital's termination of the plan "does not adversely affect [the plan's] qualification for federal tax purposes." However, the IRS qualified the ruling, saying to the hospital that "[t]his determination is subject to your adoption of the proposed amendments submitted in your letter dated 6/8/05."
On December 5, 2005, the hospital made a written proposal to the employees asking that the employees agree to allow the hospital to seize the plan's surplus assets. The document prepared by the hospital clearly states that the defined benefit pension plan "was terminated[.]" The hospital's written proposal asked the employees to waive any cause of action against the hospital and to permit the hospital to take control of the plan's surplus, in exchange for the employees *788 receiving the retirement benefits already owed to them under the plan. All of the employees refused to approve the hospital's scheme.
On January 6, 2006, the hospital's board of directors adopted a new resolution which characterized the February 2004 termination of the pension plan as "contingent" upon the approval of the hospital's employees. The new resolution declared that, since the hospital's employees had not approved of the termination, the February 2004 termination of the pension plan was rescinded.[4]
In May 2006, several hospital employees demanded that the hospital recognize that the defined benefit pension plan had been terminated, and demanded that the hospital pay the surplus in the plan to the employees who were plan participants. The employees cited to two sections of the plan in asserting that once the plan was terminated, any surplus could not be seized by the hospital. Section 9.1 of the plan gives the hospital broad powers to amend the plan, "provided that the amendment ... [d]oes not provide for a reversion of Plan assets to the [hospital] on Plan termination or otherwise." More broadly, Section 10.3 of the plan says that the hospital "will have no right, title, or interest in any portion of the Plan assets, nor may any portion of the Plan assets be returned to the [hospital] directly or indirectly[.]"
The employees argued that because the plan had been terminated in December 2003, they were plainly entitled to the surplus. As support for their argument, the employees pointed to Section 9.3 of the pension plan, which states in part that "[a]ny residual assets may be distributed to the Participants if all liabilities of the Plan to Participants and their Beneficiaries have been satisfied."
Instead of paying out the surplus, on July 6, 2006, the hospital filed an action against the employees in federal court seeking a declaratory judgment. The hospital sought an order on the hospital's "right to unilaterally terminate the Plan, distribute the assets, and retain the residual assets for its own use." See Morgan County War Memorial Hospital v. Jennifer Baker, et al., 314 Fed. Appx. 529, 531 (4th Cir.2008) (unpublished). The county-owned hospital claimed, inter alia, that its pension plan interpretation questions arose under ERISA. The federal district court dismissed the action for lack of subject matter jurisdiction on June 25, 2007, largely because "ERISA specifically excludes from its coverage any employee benefit plan that is a governmental plan." Gualandi v. Adams, 385 F.3d 236, 242 (2nd Cir.2004). The district court's order was affirmed on appeal.
On June 26, 2007, 15 of the remaining 16 employee plan participants filed the instant case against the appellant hospital.[5] The employeesappellees before this Courtasserted that the defined benefit pension plan had been terminated in February 2004, and that the surplus funds held in trust under the plan should be distributed to them. The employees also asserted that the hospital, as a fiduciary administering a trust for the employees' benefit, should be liable to the employees for breach of its fiduciary duties.
The hospital filed a motion for summary judgment in December 2008 contending that there were no genuine issues of material fact to be resolved. The employees subsequently filed a cross-motion for summary judgment.
*789 In an order dated May 4, 2009, the circuit court partially granted the employees' motion for summary judgment, and completely denied the hospital's motion. First, the circuit court found that the written language of the pension plan was clear and unambiguous. The circuit court determined that the pension plan permitted the hospital's board of directors to terminate the plan by resolution, and found that the February 2004 resolution by the hospital's board of directors clearly terminated the plan. The circuit court also determined that there was no language in the pension plan suggesting that once the plan had been terminated, the hospital's board of directors could "rescind" the termination.
Second, the circuit court found the language in the plan prohibiting any surplus assets from reverting to the hospital to be mandatory (e.g., the hospital "will have no right, title, or interest in any portion of the Plan assets"), but found the language indicating that any surplus funds be distributed to the employees to be permissive ("any residual assets may be distributed to the Participants"). The circuit court then construed the plan as a whole and concluded that the only reasonable interpretation was that, once the plan was terminated, the only alternative was for the hospital to pay the surplus funds "to the participants after ensuring that all liabilities of the Plan have been satisfied."
The circuit court declined to grant either party summary judgment on the question of whether the hospital had breached a fiduciary duty toward the employees, finding that "those claims are yet to be litigated, whether by motion or at trial."
The hospital now appeals the circuit court's May 4, 2009 partial summary judgment order.

II.

Standard of Review
We review a circuit court's summary judgment order de novo. Syllabus Point 1, Painter v. Peavy, 192 W.Va. 189, 451 S.E.2d 755 (1994). In conducting our de novo review, we apply the same standard for granting summary judgment that is applied by the circuit court. Under that standard,
[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.
Syllabus Point 3, Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York, 148 W.Va. 160, 133 S.E.2d 770 (1963). In other words,
[s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.
Syllabus Point 4, Painter. Finally, we note that "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syllabus Point 3, Painter.
Similarly, a circuit court's interpretation of a pension planwhether the plan is viewed as a trust document or as a contractis a question of law that we review de novo. See Syllabus Point 1, Chrystal R.M. v. Charlie A.L., 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law... we apply a de novo standard of review."); Syllabus Point 6, Franklin v. T.H. Lilly Lumber Co., 66 W.Va. 164, 66 S.E. 225 (1909) ("It is the province of the court, and not of the jury, to interpret a written contract."); Syllabus Point 1, Berkeley County Public Service District v. Vitro Corp. of America, 152 W.Va. 252, 162 S.E.2d 189 (1968) ("The question as to whether a contract is ambiguous is a question of law to be determined by the court.").
We now turn to the parties' arguments concerning whether the circuit court properly interpreted the language of the hospital's defined benefit pension plan, and whether the circuit court properly interpreted the language of the February 2004 resolution by the hospital's board of directors.

*790 III.

Discussion
The appellant hospital asserts a wide-ranging panoply of reasons for why the circuit court's summary judgment order was wrong. Broadly, the hospital first argues that the circuit court erred in ruling that the pension plan was terminated as a matter of law. Second, the hospital argues that whether or not the plan was terminated, the circuit court erred in awarding the surplus to the employees covered under the pension plan.
The employees generally respond with the argument that, even though the plan specifically says the hospital can never "directly or indirectly" take ownership of the plan's assets, the hospital attempted to take the surplus for its own uses when it explicitly terminated the plan in February 2004. The employees point out that the hospital repeatedly told the IRS that the plan could be amended to allow the surplus to revert to the hospital, even though the plan prohibited the hospital from ever adopting a reversion amendment. After the hospital discovered that it could not legally seize the surplus, it shifted its legal explanations and declared in January 2006 that the termination never occurred. The employees claim that the hospital essentially wishes to control the pension trust for the indefinite future until all of the employees "are dead ... [and] can no longer complain," and then seize the surplus funds without objection. The employees therefore urge this Court to affirm the circuit court's summary judgment order.
We examine the hospital's two arguments separately.

A.

Was the Pension Plan Terminated?
The hospital argues that the circuit court erred in ruling, as a matter of law, that the hospital's defined benefit pension plan was terminated by the hospital's February 2004 resolution. The hospital's appellate brief poses numerous reasons, which we distill below, for reversing the circuit court's partial summary judgment order. After careful examination, we conclude that the hospital's well-written, 49-page appellate brief is little more than a smorgasbord of red herrings intended to distract from the clear and simple language of the hospital's February 2004 resolution and the language of the pension plan.
For example, Section 1.1 of the plan document states that the pension plan "is intended to meet the provisions of Section 401(a) of the Internal Revenue Code of 1986, as amended." The appellant hospital argues that what Section 1.1 means is that the federal Internal Revenue Code, Internal Revenue Service regulations, and various Revenue Rulings are incorporated by implication into the pension planand, accordingly, the hospital insists that whether the pension plan was "terminated" can only be determined by looking to federal tax law. The hospital argues that IRS Revenue Ruling 89-87 sets forth three events that must occur in order for a pension plan to terminate:
In order to terminate a qualified plan, the date of termination must be established, the benefits of plan participants and other liabilities under the plan must be determined with respect to the date of plan termination, and all plan assets must be distributed to satisfy those liabilities in accordance with the terms of the plan as soon as administratively feasible after the date of termination.
See Rev.Rul. 89-87, 1989-2 C.B. 81. Because all three events have not occurred, the hospital argues that the plan has not been terminated under federal law.
However, upon close examination, it is clear that federal tax law has no bearing on whether the hospital's pension plan was terminated or not. The authorities cited by the hospital only apply when assessing whether or not the assets in a terminated plan are free from, or subject to, federal taxation. Revenue Ruling 89-87 is nothing more than a guideline to determine if a pension plan is still a "qualified plan" under Section 401 of the Internal Revenue Code, where an employer acts to "terminate" the plan but fails to distribute the assets "as soon as administratively feasible." In the instant case, whether or not the hospital's defined benefit pension plan retained its qualified status under *791 federal law, and whether or not the hospital will suffer adverse tax consequences for its actions, has no bearing on the interpretation of the hospital's resolution that terminated the plan in February 2004.
The appellant hospital also argues that the February 2004 termination resolution was merely a first step in a lengthy process. The hospital argues that the actual termination of the pension plan was conditioned upon the appellee employees agreeing that the plan could be terminated, and it offers as proof the deposition testimony of various hospital employees and board members who contend that they believed the termination was contingent. The hospital asserts that when the employees refused to consent to the termination of the plan, the hospital was within its rights to rescind the conditional 2004 termination resolution by passing a new resolution in January 2006.
We have recognized "the general rule that parol evidence is admissible to show conditions precedent which relate to the delivery or the taking effect of a written instrument." Hamon v. Akers, 159 W.Va. 396, 401, 222 S.E.2d 822, 825 (1976). See also, Syllabus Point 2, Miners' and Merchants' Bank v. Gidley, 150 W.Va. 229, 144 S.E.2d 711 (1965) ("Parol evidence is always admissible to show the nonexistence of a contract or to show the conditions upon which a writing is to become effective as a contract."). However, the alleged condition precedent cannot be inconsistent with the instrument. Hamon, 159 W.Va. at 401, 222 S.E.2d at 826. See also, Atkinson v. Washington and Jefferson College, 54 W.Va. 32, 48, 46 S.E. 253, 260 (1903) ("[I]f a trust is declared in writing, courts never permit parol proof of a trust to contradict an intention expressed upon the face of the instrument, for that would be to allow parol evidence to vary, contradict, or annul a written instrument.").
After carefully examining the record, it is clear that the February 2004 resolution by the hospital's board of directors plainly and unconditionally stated that "the Plan is terminated[.]" In the instant case, the alleged conditions precedent which the hospital later asserted existed were inconsistent with the language of the pension plan and with the hospital's February 2004 resolution terminating the plan. The circuit court therefore properly focused its attention exclusively upon the language in the documents.
Another tack taken by the hospital is to assert that a resolution by a board of directors to terminate a pension plan, without more, does not actually terminate the plan. As authority, the hospital cites to one case, Jensen v. Moore Wallace North America, 249 Fed.Appx. 391 (6th Cir.2007), an unpublished decision from the federal Sixth Circuit Court of Appeals. In Jensen, an employer wrote a letter to its employees informing them that it was "changing the structure" of its pension plan and that the "pension plan would terminate" at a later date. The employer later changed course, telling the employees it would not terminate the pension plan. The employees sued to compel the termination of the pension plan, and to have surplus assets in the plan paid to the employees. The court of appeals affirmed the district court's ruling in favor of the employer that, under ERISA, the pension plan had not been terminated.
The appellant hospital suggests that the Jensen court merely relied on basic principles of contract interpretation, and that this Court should reach the same result. After reading the Jensen decision, we disagree and find Jensen to be both factually and legally distinguishable. First, unlike the hospital's pension plan in the case at bar, the plan at issue in Jensen had been amended by the employer to remove all anti-reversion language, thereby clearly allowing the Jensen employer the right to any surplus funds. As previously noted, that language was not, and could not, be amended into the hospital's defined benefit pension plan. Second, unlike the hospital's February 2004 resolution, the employer in Jensen indicated that the pension plan would be terminated at a future date, and kept revising that date before finally abandoning the effort.
Third, and most important, unlike the plan in the instant case, the pension plan in Jensen was controlled by ERISA, which lays out a four-step process for terminating a plan. See 29 U.S.C. § 1341(a)(1) (ERISA is the "exclusive means of plan termination."); *792 Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (ERISA supplies the "sole avenues for voluntary termination" of a plan). The federal court in Jensen concluded that because the employer "failed to complete all of the steps that ERISA requires for plan termination, that eliminates as a matter of law any possible claim [the employees] might have stemming from a termination." In the instant case, the parties agree that ERISA has no bearing on our decision, and the federal courts have specifically found that the hospital cannot rely upon ERISA "because ERISA does not even apply to governmental plans." Morgan County War Memorial Hospital v. Jennifer Baker, et al., 314 Fed. Appx. 529, 534 (4th Cir.2008) (unpublished). We therefore find that Jensen provides no guidance for our resolution of the instant case.
The hospital also asserts that its February 2004 resolution was a "mere formality," and should be read in light of its surrounding circumstances, the situation of the parties, and their subsequent conduct. These surrounding circumstances, the hospital argues, should have made it clear to the circuit court that the pension plan was not actually terminated by the February 2004 resolution.
As authority for its position that the subsequent actions of the hospital are important to understanding the February 2004 resolution, the hospital cites to Chesapeake & O. Ry. Co. v. Deepwater Ry. Co., 57 W.Va. 641, 50 S.E. 890 (1905), where the Court adopted a rule for interpreting ambiguous corporate resolutions. To understand the Court's decision requires a brief recitation of the facts. In Chesapeake, two railroad companies raced to be the first to build a rail line through the mountains at a place called Jenny's Gap, and questions arose over which railroad had first perfected its right to build in Jenny's Gap. Upon learning that the Chesapeake & Ohio Railway intended to build a rail line through Jenny's Gap, the shareholders for the Deepwater Railway approved a resolution extending the rail line "on the most practicable route[.]" The Deepwater board of directors then met and adopted a resolution to do "all things further that may be necessary" to carry out the shareholders' resolution. 57 W.Va. at 647-48, 50 S.E. at 892-93.
The Chesapeake & Ohio argued that the two Deepwater resolutions had no effect because they were vague and made no reference to any maps or surveys through Jenny's Gap. The Court conceded that the Deepwater shareholders' and board of directors' resolutions were somewhat ambiguous. 57 W.Va. at 669-674, 50 S.E. at 901-904. However, the Court then examined the actions of the Deepwater Railway before and after the resolutions, including the subsequent filing of surveys, maps and actions to buy land and lay track, and concluded that the true meaning and purpose of the publicized resolutions was to build a rail line through Jenny's Gap. To aid in construing such ambiguous corporate resolutions, the Court held in Syllabus Point 13 of Chesapeake (with emphasis added):
To aid in ascertaining the true meaning and purpose of a resolution passed by the board of directors of a corporation, the terms of which are not certain and definite, resort may be had to the circumstances under which it was passed, the situation of the company, the object of the resolution and the meeting at which it was passed, and the contemporaneous and subsequent conduct of the corporate authorities in respect to it, and parol evidence is admissible in applying descriptive terms used to the subject-matter.
The Court concluded that under the circumstances, it was clear that the Deepwater Railway was the first to perfect its right to build a railroad through Jenny's Gap.
The key to our holding in Syllabus Point 13 of Chesapeake is that before a court may rely upon extrinsic evidence to interpret a corporate resolution, the resolution must be ambiguous and the terms "not certain and definite." The Chesapeake decision is thus distinguishable from the instant case. Because the hospital's February 2004 resolution is "certain and definite" in its expression that "the Plan is terminated," it would have been improper for the circuit court to have attempted to give the resolution a new meaning by looking to the subsequent conduct of the hospital.
*793 We therefore find that the circuit court properly concluded that no question of material fact remained to be resolved, and properly concluded that the hospital terminated the defined benefit pension plan in its February 2004 resolution.

B. Should the Plaintiffs Have Been Awarded the Surplus?

The appellant hospital also kvetches that, regardless of whether or not the defined benefit pension plan was terminated, the circuit court erred in awarding the surplus to the plan participants. The hospital contends that the written plan does not require that any surplus be distributed, but says that residual assets "may" be so distributed. The plan states:
Any residual assets may be distributed to the Participants if all liabilities of the Plan to Participants and their Beneficiaries have been satisfied and the distribution does not contravene any provision of law.
The hospital asserts that this paragraph preserves the hospital's right to do something else with the surplus, such as transfer the assets to a completely different defined contribution pension plan managed by the hospital for the benefit of the employees. This position is contrary to the hospital's initial position that the surplus funds could be used by the hospital for the construction of new facilities.
The word may should be construed as synonymous with the word shall when any other interpretation "would manifestly defeat the object of the provisions" of an agreement. In re Application for License to Practice Law, 67 W.Va. 213, 224, 67 S.E. 597, 601 (1910). See also, State ex rel. Trent v. Sims, 138 W.Va. 244, 272, 77 S.E.2d 122, 139 (1953) ("[T]the word `may' should be read `must' when the intention so requires[.]"); Chapple v. Fairmont General Hosp., Inc., 181 W.Va. 755, 760 n. 4, 384 S.E.2d 366, 370 n. 4 (1989) ("[W]ithin the context of the collective bargaining agreement, "may" means "must". No other options are available.") Furthermore, our Court held in an early decision that the "word may means must or shall" in those instances where "the public interest and rights are concerned, and where the public or third persons have a claim, de jure, that the power should be exercised." In re Application for License to Practice Law, 67 W.Va. 213, 222, 67 S.E. 597, 601 (1910).
After careful consideration of the language and intent of the plan, we believe that the circuit court fairly concluded that the only permissible option for the surplus assets in the plan is that they be distributed to the plan participants. Shifting the surplus assets from the defined benefit pension plan to a differently funded defined contribution pension plan with new participants might have been an alternative prior to termination; however, once the hospital unilaterally terminated the defined benefit pension plan this was no longer an option. If the hospital truly wished to merge the two plans (assuming such a merger could have been legally accomplished in light of plan language preventing the hospital from seizing any plan assets "directly or indirectly"), then it should have attempted to do so before adopting its termination resolution in February 2004. It did not. Once the plan was terminated, the only feasible option permitted was to satisfy all liabilities of the plan to the plan participants and their beneficiaries, and to then distribute any residual assets to the participants.

IV.

Conclusion
The circuit court's May 4, 2009 partial summary judgment order is affirmed.
Affirmed.
NOTES
[1] Subsequently, the hospital adopted a different "defined contribution" pension plan for its employees.
[2] Section 9.2 of the hospital's defined benefit pension plan states, in part:

While the Employer expects and intends to continue the Plan, the Employer reserves the right to terminate the Plan at any time in its sole discretion. The Plan will terminate (a) by resolution of the Employer's Board of Directors, (b) upon the dissolution, merger, consolidation or reorganization of the Employer or (c) upon the sale by the Employer of all or substantially all of its assets unless a successor is substituted for the Employer[.]
[3] The hospital's February 24, 2004 resolution stated:

WHEREAS, the Board of Directors of the Employer now desires to terminate the said Plan effective December 31, 2003;
NOW, THEREFORE, BE IT RESOLVED, that the Plan is terminated effective as of the date noted above; and
BE IT FURTHER RESOLVED, that the appropriate officers of the Employer be, and hereby are, authorized and directed to take the following actions on behalf of the Employer:
1. To make application to the Internal Revenue Service for a determination upon termination of the Plan to the effect that the plan is qualified under Code Section 401(a); and
2. To make any changes to the Plan required by the Internal Revenue Service as a condition of the issuance of a favorable determination letter or to authorize such action as may be required to cause the Plan to be qualified under the Code; and
3. To make distributions under the terms and conditions of the Plan as soon as administratively feasible once the Plan has received a favorable letter from the Internal Revenue Service; and
4. To return to the Employer all monies remaining after the satisfaction of all liabilities to Plan Participants.
[4] The January 6, 2006 resolution states (with emphasis added):

WHEREAS, the Board previously adopted resolutions to terminate the Plan effective as of December 31, 2003, contingent upon obtaining a release from each participant which would allow the Plan to be amended to provide for the return to the Employer of all assets of the Plan remaining after satisfaction of all liabilities to Plan participants; and
WHEREAS, the Board has determined, in its best business judgment, due to its inability to obtain the releases from all participants, to postpone the Plan termination and to rescind its prior resolutions which terminated the Plan;
NOW, THEREFORE, BE IT RESOLVED, that the consent resolutions executed by the Board of Directors on February 24, 2004 approving the termination of the plan effective December 31, 2003 are hereby rescinded; ...
[5] Also named in the suit are John Borg, the hospital's administrator, and Valley Health System, an independent company that was contracted to operate the hospital.